Stella **ROMANSKI,** Plaintiff,

v.

**DETROIT ENTERTAINMENT, L.L.C.** d/b/a MotorCity Casino, a Michigan Corporation, **Marlene Brown, Gloria Brown, Robert Edwards,** and **Joetta Stevenson,** Jointly and Severally, Defendants.

No. 02–73358.

United States District Court, E.D. Michigan, Southern Division.

May 28, 2003.

Neil H. Fink, Birmingham, MI, for Plaintiff.

Robert F. MacAlpine, John B. Farrell, Garan Lucow, Detroit, MI, for Defendants.

### OPINION AND ORDER

ZATKOFF, Chief Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment. Plaintiff responded. The Court finds that

the parties have adequately set forth the relevant law and facts, and that oral argument would not aid in the disposition of the instant motion. *See* E.D. MICH. LR 7.1(e)(2). Accordingly, the Court ORDERS that the motion be decided on the briefs submitted. For the reasons set forth herein, Defendants' Motion for Summary Judgment is DENIED.

## I. BACKGROUND

Plaintiff's Second Amended Complaint was removed by the Defendants from the Wayne County Circuit Court on August 19, 2002. Her Second Amended Complaint contains the following four counts:

1. False Arrest and Imprisonment;
2. Defamation;
3. Intentional Infliction of Emotional Distress; and
4. Violation of 42 U.S.C. § 1983.[1]

Defendants filed a motion for summary judgment on these counts. The Court shall now describe the facts surrounding Plaintiff's action, and will then briefly describe the procedural history of this action.

### A. Factual History

Ms. Stella Romanski, a grandmother of nine children, and her two friends, Ms. Dorothy Dombrowski and Ms. Linda Holman, enjoyed spending time together by periodically visiting casinos in the Detroit area. On August 7, 2001, Ms. Romanski, and her two friends took advantage of a promotion offered by Defendant MotorCity Casino.[2] Basically, for $9.00, MotorCity Casino, which is located near downtown Detroit, Michigan, offered to provide transportation to and from the casino, as well as a complementary lunch at the casino's Classic Buffet. In particular, in the morning, a casino bus would pick up patrons in Sterling Heights, Michigan—which is a suburb of Detroit—and would drive them to the casino. The patrons would then spend several hours in the casino, and, in the evening, a casino bus would return the patrons to Sterling Heights.

Ms. Romanski and her friends arrived at the casino late in the morning, roughly around 11:30 a.m. They had agreed to split up, however, they would meet each other for lunch at the buffet at 1:30 p.m. After they went their separate ways, Ms. Romanski headed towards the "nickel" slot machines. Over the course of the next hour, she primarily played at one machine. At about 12:30, she stood up, walked by some of the other slot machines in her area, and returned to the machine that she had been playing for the previous hour. While she was walking around, she noticed that there was a token worth five cents lying in the tray of an abandoned slot machine. She picked it up and took it with her. When she returned to the slot machine that she had been playing, she put a twenty-dollar bill into the machine, along with the five cent token. What happened next is subject to dispute.

Ms. Romanski alleges that she began playing the machine again; she testifies that she knew that she played it thirteen times because she counted her money when she returned home. While she was playing the machine, four security officers surrounded her, and asked to her to accompany them. The security officers, still surrounding her, led her to the casino's security office. When they got to the security office, Ms. Romanski was seated at a desk, and three female security officers surrounded her. One officer informed Ms.

---

1. Plaintiff's Second Amended Complaint contained five "counts," however, one of her counts seeks "exemplary damages," which, by itself, is not a cause of action.

2. "MotorCity" is the way that the casino's name appears in the documents submitted.

Romanski that she stole a coin from the slot machine tray, and that she committed a crime. Ms. Romanski began to cry at the thought that she, a grandmother of nine children, could commit a crime. The security officers made her cash out. After her money was counted, she had $14.10; the security officers gave her a ten-dollar bill, four one-dollar bills, and two nickels. A security officer, however, kept one of the two nickels; this way, the casino had recovered the money that was stolen from it.

Afterwards, the security officers took a photograph of Ms. Romanski, and photocopied her driver's license. A security officer also asked for Ms. Romanski's Social Security number; while Ms. Romanski was hesitant to surrender such information at first, the security officer told Ms. Romanski that she was a "policewoman," afterwards Ms. Romanski surrendered the information. A few minutes later, a woman approached Ms. Romanski, and informed her that she was banned from the casino for six months, and that she had to leave. It occurred to Ms. Romanski that it was almost time for her to meet her friends for lunch, accordingly, she requested to at least have lunch with her friends; a security officer, however, denied that request, and informed Ms. Romanski that she had lost all of her rights, and that she was banned from the casino.

After Ms. Romanski was informed that she had to leave the casino, three security officers escorted her out of the casino. Ms. Romanski stated that she felt sick, and that she wanted to use the bathroom. While they let Ms. Romanski use the restroom, one of the female security officers followed her into the restroom, and then followed Ms. Romanski into her stall. After Ms. Romanski was done with the restroom, the security officers escorted her to the valet area. They pointed to an area some distance away, and stated that her bus would arrive there at 3:00 p.m.

After the security officers left, Ms. Romanski used a cellular telephone to contact her friends and inform them that she had been banned from the casino. Her friends thought it was a joke at first, and could not believe that Ms. Romanski would steal anything. Concerned, however, Ms. Holman and Ms. Dombrowski asked casino personnel if what Ms. Romanski told them was true. Sometime later, casino personnel informed Ms. Romanski's friends that Ms. Romanski was banned from the casino for theft.

Around 3:00, Ms. Romanski left the valet area and walked over to the area where she was told to go in order to wait for a bus to take her home. After she crossed Grand River Ave., and negotiated relatively heavy traffic, she discovered that it was not the proper bus, and that her bus would not arrive for another two hours. Because Ms. Romanski was not allowed back into the casino, she had to wait outside on a hot day for the next bus to arrive.

A short time later, Ms. Romanski's two friends found her. The three women went back to the casino, and waited in the vestibule area in order to get out of the heat. Casino security officers noticed that Ms. Romanski had re-entered the casino; they approached the three women and informed them that Ms. Romanski was banned, and had to wait outside. In response, one of Ms. Romanski's friends, Ms. Dombrowski, stated that she thought that this was a "stupid" situation. One of the security officers took offense to the comment, and accused Ms. Dombrowski of calling the security officer stupid, and began to physically intimidate Ms. Dombrowski. The three women then left the casino again, and waited for the bus to take them back to Sterling Heights.

Defendants' account of the facts is different. Defendants state that a security officer, Defendant Marlene Brown, was

working undercover, or in "plainclothes" on August 7, 2001. She noticed Ms. Romanski take a token worth a nickel out of the tray of a slot machine that she was not playing. She then saw Ms. Romanski prepare to play the token; Ms. Romanski placed the token in the slot machine, but before she had a chance to play it, Defendant Marlene Brown approached Ms. Romanski, and informed Ms. Romanski that she had taken casino property. Defendant Marlene Brown explained that the casino had a policy in which it considered money left in a tray of a slot machine to be casino property, and that Ms. Romanski had therefore taken casino property. In response, Ms. Romanski became hostile and raised her voice in objection. Defendant Marlene Brown, who was new at doing undercover security work, signaled to the other undercover security officers, Defendants Gloria Brown and Robert Edwards, that she needed assistance. When it appeared that Ms. Romanski was not going to calm down, they decided to take her to the security office; during her deposition, Defendant Marlene Brown stated: "Well, my instinct was to just tell her and let her just go finish gaming, okay, but like I said, she was getting kind of loud, and that's when I called Sky[3], and that's when I called my partners. That's when I was instructed to bring her to the office." *See* Dep. of M. Brown, 65.

Defendants also state that after Ms. Romanski was taken to the security office, the decision was made to ban her from the casino largely because she continued to be hostile—even belligerent. Indeed, Defendant Marlene Brown stated during her deposition that Ms. Romanski was banned from the casino "[b]ecause of her attitude," and not because she committed a "crime." *See id.* at 75. After she was banned, Ms.

Romanski was led to the air-conditioned valet area, where she was allowed to remain until her bus arrived. Defendants state that Ms. Romanski freely chose to leave the valet area and wait outside in the heat. Defendants also state that after Ms. Romanski met with her friends, the three women decided to wait in the lobby of the casino until their bus arrived. When Defendant Marlene Brown approached to ask Ms. Romanski to leave, Ms. Romanski's friends began to yell at Defendant Marlene Brown and call her "stupid."

These are the disputed facts. The parties do not dispute the fact that the casino has a policy that states that tokens found in the trays of abandoned slot machines are considered casino property, and no one, except the person who won it, has a right to pick up such a token. If, however, a token is found on the floor, anyone can pick it up and keep it. In addition, it is not disputed that this policy is not made known to the public; there are no signs or other warnings posted in the casino to inform patrons of such a policy. It is this policy that is at the heart of the present dispute.

## B. Procedural History

Plaintiff first filed her complaint in Wayne County Circuit Court on November 9, 2001. On August 19, 2002, the Wayne County Circuit Court granted Plaintiff leave to file her Second Amended Complaint. The most notable feature about Plaintiff's Second Amended Complaint is that it added a claim under 42 U.S.C. § 1983. Defendants removed to this Court on August 19, 2002.

On September 4, 2002, the Court ordered the parties to Show Cause as to why Plaintiff's claim under 42 U.S.C. § 1983 should not be dismissed, and Plaintiff's

---

**3.** "Sky" refers to the casino's system of surveillance. Despite the existence of security cameras in the casino, Defendants

are not able to produce a video tape of the incidents at issue.

state law claims should not be remanded. In particular, the Court noted that a defendant must act under the color of state law to be held liable under § 1983, and that all of the Defendants in this action are private actors. Both parties filed responses. On September 19, 2002, the Court found that it had jurisdiction under § 1983, because the Defendant security officers are state actors acting under the color of state law. The Court reasoned that the Defendant security officers were vested with all the authority of a peace officer while they were acting within the scope of their authority. In addition, the Court retained jurisdiction over the supplemental state law claims.

Presently, Defendants, who removed this action to this Court, seek to have this action remanded to state court.

## II. LEGAL STANDARD

Summary judgment is appropriate only if the answers to interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable or is not sig-

nificantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993).

## III. ANALYSIS

The Court shall now rule upon Defendants' arguments in the most logical order.

### A. 42 U.S.C. § 1983

The Court shall first rule upon Defendants' argument that the Court lacks jurisdiction over this matter. Defendants argue that the individual Defendant security officers were not state actors acting under color of state law, and therefore, cannot be found liable under 42 U.S.C. § 1983. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Thus, the Court would lack jurisdiction to hear this action, and this action should be remanded to the Wayne County Circuit Court.[4]

---

**4.** The Court notes that Defendants removed this action to this Court. Defendants now argue that the Court was wrong to retain

jurisdiction over this action, and argue that the Court should remand this matter. In so doing, however, Defendants are effectively ar-

### 1. State Action

 In its September 19, 2002, Order, the Court found that the individual Defendant security officers were state actors acting under color of state law. The Court based its decision on the fact that under Michigan law, an employer may maintain private security guards in order to protect its property, however, it may also employ private security police. *See* MICH. COMP. LAWS § 338.1079. A private security police officer who is properly licensed by the State of Michigan has the authority to arrest a person without a warrant when that private security police officer is on his employer's property. *See* MICH. COMP. LAWS § 338.1080. This authority to make warrantless arrests is the same authority that is granted to a peace officer. *See id.* Any person seeking a license to become a private security police officer must comply with the requirements found in the statute, *see* MICH. COMP. LAWS § 338.1067, and must comply with the training requirements promulgated by the Michigan Department of Consumer and Industry Services, *see* MICH. COMP. LAWS § 338.1081. After reviewing the relevant case law, the Court found that the individual Defendant security officers were state actors for purposes of 42 U.S.C. § 1983 because they are properly licensed security officers who have police powers pursuant to MICH. COMP. LAWS § 338.1080.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

be liable to the party injured in an action of law....

As this statute has been interpreted, Plaintiff must demonstrate that Defendants deprived her of a right secured by either the Constitution or a statute while Defendants were "acting 'under color of state law.'" *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir.2003) (en banc) (quoting *Wolotsky v. Huhn* 960 F.2d 1331, 1335 (6th Cir. 1992)). Under § 1983, a private party's actions may constitute state action; those actions, however, must be " 'fairly attributable to the state.'" *See id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 947, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). State action may be found if a private person exercised powers that are traditionally reserved to the State. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *see also Chapman*, 319 F.3d at 833. This is known as the public function test. *See Chapman*, 319 F.3d at 833. The public function test is narrowly interpreted. *See id.* Examples of functions that are typically reserved to the State include exercising eminent domain and holding public elections. *See id.* (citations omitted).

The United States Supreme Court has never determined whether a private security guard who is cloaked with the authority of a police officer is a state actor performing a public function that is traditionally reserved to the state. *See Payton v. Rush–Presbyterian–St. Luke's Med. Ctr,* 184 F.3d 623, 628 (7th Cir.1999) (citing *see Flagg Bros., Inc., v. Brooks,* 436 U.S. 149, 163–64, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)); *see also* 1A MARTIN A. SCHWARTZ & JOHN E. KIRKLIN, SECTION 1983 LITIGATION: CLAIMS AND DEFENSES § 5.13 n. 233 (3d ed.1997). A number of

---

guing that not only was the Court wrong in retaining jurisdiction, but that Defendants themselves were wrong in removing the ac-

tion in the first place. As the Court's analysis demonstrates, however, both the Court and the Defendants were right the first time.

federal courts have confronted this question, however, and have held that a private security guard is a state actor when he or she is vested with the authority of a police officer. *See Payton,* 184 F.3d at 628–29 (cataloguing and discussing relevant cases). For instance, in *Payton,* private security personnel could be licensed by the City of Chicago to serve as "special police officers;" these special police officers had all the powers of a regular Chicago police officer. *See id.* at 624–25. The Seventh Circuit found that such privately employed special police officers could be found to be state actors performing a public function that is traditionally reserved to the State. *See id.* at 630. Likewise, in *Henderson v. Fisher,* the Third Circuit held that the campus police at the University of Pittsburgh are state actors performing a public function, and partially based its decision on the fact that a Pennsylvania statute "has delegated to the campus police of the University of Pittsburgh the very powers which the municipal police force of Pittsburgh possesses." 631 F.2d 1115, 1118 (3d Cir. 1980). In making its decision, the Third Circuit noted: "[T]he delegation of police powers, a government function, to campus police buttresses the conclusion that the campus police act under color of state authority." *Id.* And, at issue in *Rojas v. Alexander's Dept. Store, Inc.,* was a New York City ordinance that permitted private security guards to obtain a license that vested them with all the power of the city police; the Eastern District of New York held that: "[s]uch a special patrolman, with the power to arrest, is a government official subject to section 1983 liability." 654 F.Supp. 856, 858 (E.D.N.Y. 1986) (citing *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951)).

After reviewing the decisions listed above, as well as a number of other federal court decisions, the Court finds these decisions to be persuasive. At common law, private citizens had certain powers that resemble police authority. For example, at common law, a private storekeeper had a right to protect his or her property, and could thus detain an individual if the shopkeeper suspected that individual of theft. *See City of Grand Rapids v. Impens,* 414 Mich. 667, 327 N.W.2d 278, 281 (1982) (citation omitted). As another example, at common law, private persons had the right to use deadly force in self-defense. *See Payton,* 184 F.3d at 629 (citing *Wade v. Byles,* 83 F.3d 902, 905 (7th Cir.1996)). Other powers, however, such as the power to arrest others for violations of State statues or local ordinances, are powers that are vested in the State alone, and cannot be exercised by a private individual unless that individual is vested with such authority by the State. *See Payton* 184 F.3d at 630; *see also Thompson v. McCoy,* 425 F.Supp. 407, 409–10 (D.S.C.1976). Thus, a private individual who is vested with the powers of a police officer—which are powers that are only vested in the State, and those private individuals to whom the State has given such powers—is a state actor acting under color of state law for purposes of § 1983.

Contrary to Defendants' assertions, this rationale is contradicted by neither the Sixth Circuit's recent decision in *Chapman v. Higbee Co.,* 319 F.3d 825 (6th Cir.2003) (en banc), nor the Michigan Supreme Court's decision in *City of Grand Rapids v. Impens,* 414 Mich. 667, 327 N.W.2d 278 (1982). In *Chapman,* a private security guard working at a department store suspected that the plaintiff was stealing from the security guard's store, and temporarily detained the plaintiff to do an investigation. *See Chapman,* 319 F.3d at 828. The Sixth Circuit held that the fact that a private security guard may investigate a crime does not transform the security guard's action into state action. *See id.* at

834. In supporting its rationale, the Sixth Circuit quoted the Fifth Circuit, and stated:

> A merchant's detention of persons suspected of stealing store property simply is not an action exclusively associated with the state. Experience teaches that the prime responsibility for protection of personal property remains with the individual. A storekeeper's central motivation in detaining a person whom he believes to be in the act of stealing his property is self-protection, not altruism. Such action cannot logically be attributed to the state.

*Id.* (quoting *White v. Scrivner Corp.*, 594 F.2d 140, 142 (5th Cir.1979)). Therefore, there is nothing inconsistent with what the Sixth Circuit stated in *Chapman*, and this Court's holding that the individual Defendant security officers are state actors: a security guard that is merely exercising common law rights, such as detaining individuals who are suspected of theft, is not a state actor; a security guard that exercises authority that is traditionally reserved to the State, however, such as the power to arrest, is a state actor acting under the color of state law.

The Michigan Supreme Court's holding in *Impens* is also consistent with the Court's ruling that the individual Defendant security officers are state actors. In *Impens*, private security guards employed at a retail store detained an individual who was suspected of shoplifting. *See Impens*, 327 N.W.2d at 279. The security guards were able to elicit a written confession from the individual, and then turned that confession over to the Grand Rapids police. *See id.* The individual argued that the signed confession should have been suppressed because he was not read his *Miranda* warnings. *See id.* at 279–80. The Michigan Supreme Court found that the confession was admissible, and held that the security guards were not law enforcement officials. *See id.* at 282. During its discussion, the Michigan Supreme Court noted that the security guards who took the confession were simply exercising the common law right to detain an individual suspected of theft. *See id.* at 281–82 (citations omitted). Therefore, upon reviewing this case law, the Court determines that there is nothing inconsistent with the cases that Defendants cite and the Court's original holding that the individual Defendant security officers were state actors acting under color of state law.

■ In their final attempt to argue that the Court lacks subject matter jurisdiction, Defendants argue that the individual Defendant security officers in this action were doing nothing more than exercising their right to temporarily detain Plaintiff, and were not exercising their police-like authority, thus they were not acting as state actors. Indeed, Defendants maintain that Plaintiff was never actually arrested—she was never handcuffed nor patted down. Viewing the facts in the light most favorable to Plaintiff, however, the Court notes that a jury could find that the individual Defendant security officers in fact arrested her. Defendants did more than merely temporarily detain Plaintiff for the sake of investigating a crime: when Defendant Marlene Brown first approached Plaintiff, Defendant Brown lifted up her jacket and showed Plaintiff her security badge, as well as her handcuffs; meanwhile, Plaintiff was surrounded by a number of security officers while she was sitting at a slot machine, one of whom was wearing a security uniform; afterward, Plaintiff was surrounded by the security officers as they led her to the security office; after they got her into the security office, Plaintiff was made to sit at a table, and there were two security officers standing behind her, one security officers guarding the door, and another one, presumably Defendant Marlene Brown, "hov-

er[ing]" over her—again, at least one security officer was uniformed; the Defendant security officers took a photograph of her, and photocopied her driver's license and Social Security card; although Plaintiff initially refused to hand over her Social Security card, she did so after one of the Defendant security officers, presumably Defendant Marlene Brown, stated that she was a "policewoman;" Plaintiff was not permitted to see her friends for lunch; in total, she was detained for roughly forty-five minutes to an hour; after her detention, she was escorted out of the casino by three Defendant security officers; and a Defendant security officer followed Plaintiff into the bathroom, and even stood in the same stall as Plaintiff. Clearly, a jury could find that Defendants did not simply temporarily detain Plaintiff in order to investigate her potential theft of five cents.

### 2. Constitutional Violation

■ Defendants argue that even if the Court finds state action that they did not violate any of Plaintiff's constitutionally protected rights. In her Second Amended Complaint, Plaintiff alleges a violation of her Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.[5] Defendants argue that even if Plaintiff was arrested that her arrest was supported by probable cause. Basically, Defendants state that Defendant Marlene Brown witnessed Plaintiff commit a crime by taking a token out of the tray of an abandoned slot machine, which is a crime, therefore, she had probable cause to arrest Plaintiff. *See Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001).

Defendants' argument fails for two reasons. First, Defendant Marlene Brown

admitted during her deposition that the only reason Plaintiff was taken to the security office and was banned from the casino was because of her "attitude," and not because she actually stole anything from the casino. *See* Dep. of M. Brown, 65–66, 75. And second, Plaintiff correctly points out that a jury could find that she never actually stole anything from the casino.

Central to much of Defendants' argument that Plaintiff committed a crime is a Michigan statute that declares that a person commits a felony if that person:

> claims, collects, takes, or attempts to claim, collect or take money or anything of value in or from the gaming games, with intent to defraud, without having made a wager contingent on winning a gambling game, or claims, collects, or takes an amount of money or thing of value of greater value than the amount won.

MICH. COMP. LAWS § 432.218(2)(j). The plain language of the statute demonstrates that an element of the offense is "intent to defraud." This necessarily implies that the victim—either the casino or another patron of the casino—must have had legal title to the property that is claimed or taken; obviously, a person can neither defraud himself, nor can he defraud anybody if he takes a piece of property that was abandoned. *See Courtney v. Feldstein,* 147 Mich.App. 70, 382 N.W.2d 734, 736 (1985) (stating that, under Michigan law, fraud requires damage to the victim). Thus, in the present action, in order to find that Plaintiff committed a crime, the Court must determine whether the casino had legal title to the five cents.

Defendants maintain that the five cent token that is at the center of this action

---

5. In her brief responding to Defendant's Motion for Summary Judgment, Plaintiff also states that her due process rights under the Fifth Amendment was violated. Plaintiff, however, does not raise this claim in her complaint; therefore, the Court shall not address a claim for a violation of due process.

belonged to the casino. Defendants base their assertion on the fact that the casino has a rule—which is not made known to the casino's patrons until after a patron violated the rule—that states, in essence, that if a token is found on the floor then anyone can pick it up and treat it as if it were his or her own; he or she may keep it or play it. If, however, a patron finds a token lying in the tray of an abandoned slot machine then the token is considered by the casino to be casino property, and nobody but the person who won that token can take it. Defendants' argument, however, is contrary to law.

When a person places money into a gambling game, that person is effectively entering into an aleatory contract with the casino; an aleatory contract is one in which a party's duty to perform is conditioned upon some fortuitous event, such as winning at a slot machine. *See* RESTATE-MENT (SECOND) OF CONTRACTS § 232 cmt. c (1981). Upon the happening of the fortuitous event, the casino is under an obligation to surrender money or some other valuable item to the other party in the aleatory contract; in other words, the casino loses its legal right to the property, and the other party gains that right. Consequently, when a person is successful at a gambling game, such as a slot machine, and the slot machine pays that person, the casino loses its rights to the property paid, and the person who won the property becomes entitled to exclusive use and possession of the property.

Because, for the purposes of this motion, the Court views the facts in the light most favorable to the Plaintiff, it will assume that the token that Plaintiff found lying in the tray of the abandoned slot machine was won by another patron, however, that other patron walked away without collect-ing the token at issue; in short, the Court will assume that it was abandoned—the Court also notes that there is no other likely explanation for the token being in the tray of the slot machine. Thus, for purposes of this motion, the Court finds that the property was abandoned. Under Michigan law, the finder of abandoned property has a superior claim to said property than does the owner of the *locus in quo*. *See People v. Twenty–Seven Thousand Four Hundred Ninety Dollars*, 1996 WL 33348190, *1 (Mich.Ct.App. Nov.26, 1996) (citing and discussing MICH. COMP. LAWS § 434.21 *et. seq.*). Therefore, the Court concludes that Plaintiff had superior title to the five cents than did the casino. Accordingly, Plaintiff did not defraud, nor could she have had the intent to defraud, the casino because under Michigan law, Plaintiff—not the casino—had title to the abandoned piece of property.

As a consequence, the Court finds that a jury could find a constitutional violation pursuant to 42 U.S.C. § 1983. In particular, the individual Defendant security officers did not have probable cause to arrest Plaintiff because Plaintiff committed no crime; she simply claimed a piece of abandoned property.[6] This is not a case where a police officer reasonably relied on a presumptively constitutional statute or ordinance that was subsequently declared unconstitutional. *See, e.g., Michigan v. DeFillippo*, 443 U.S. 31, 37–38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). If it were, then the police officer would be entitled to a valid, good-faith defense. *See id.* Here, however, the individual Defendant security officers based their actions on an unpublished casino rule that is inconsistent with Michigan law. It is a general axiom that ignorance of the law is no excuse.

---

6. Indeed, if the jury finds the five cent token to have been abandoned, then it can be stated that the casino stole the five cents from Plain-

tiff, because she had title to it after she found it.

*See City of Kentwood v. Estate of Sommerdyke,* 458 Mich. 642, 581 N.W.2d 670, 683 (1998) (Taylor, J., concurring in part and dissenting in part). Consequently, the individual Defendant security officers cannot claim that they reasonably relied on the unpublished casino rule[7] in good faith. Accordingly, a jury can find that the individual Defendant security officers did not make a reasonable seizure, and thereby violated the Fourth Amendment.

### 3. Conclusion

The Court finds that the individual Defendant security officers were state actors acting under color of state law, and that a jury could find that they violated Plaintiff's right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution. Therefore, the Court shall deny summary judgment on this issue.

### B. False Arrest/False Imprisonment

■ In her complaint, Plaintiff alleged that she was subject to a false arrest/false imprisonment by the individual Defendant security officers. Under Michigan law, the elements of false arrest are: 1) an arrest; 2) of a person; 3) who is innocent of the charge on which he is arrested; 4) by the defendant or at his instigation; 5) without legal justification. *See Lewis v. Farmer Jack Div., Inc.,* 415 Mich. 212, 327 N.W.2d 893, 901 (Williams, J. dissenting). In turn, the elements of false imprisonment are: 1)

actually confining another; 2) intentionally performing the act of confining another; 3) the act of confining another was performed without legal justification; and 4) the victim was aware of the confinement. *See Moore v. City of Detroit,* 252 Mich.App. 384, 652 N.W.2d 688, 691 (2002). Michigan courts have held that false arrest is one type of false imprisonment; when a person is falsely arrested, he or she is always falsely imprisoned. *See Moore,* 652 N.W.2d at 690 (citing *Lewis,* 327 N.W.2d at 900–01 n. 4 (Williams, J. dissenting)).

A jury could find that Plaintiff was falsely arrested and falsely imprisoned. As for the claim of false arrest, there is no question that Plaintiff is a person, and that she was detained by the individual Defendant security officers. And, for the reasons stated in *Sections IV. A. 1. & 2.* of this Opinion and Order, a jury could find that Plaintiff was arrested. Therefore, the first, second, and fourth elements of this tort are satisfied. In addition, for the reasons set for in *Section IV. A. 2.* of this Opinion and Order, a jury could find that Plaintiff is not guilty of the crime of stealing money from the casino. Finally, for the reasons stated in *Section IV. A. 2.* of this Opinion and Order, the Court finds, as a matter of law, that the individual Defendant security officers cannot rely on the existence of the casino rule to provide legal justification their arrest of Plaintiff. Therefore, a question of fact exists on

---

7. This rule can be described as a "secret" rule, which is kept secret until the time someone violates the rule. For instance, during her deposition, Defendant Joetta Stevenson stated the following:

Q: Now, is there a written casino policy that prohibits [taking tokens from the tray of an abandoned slot machine]?
A: No.
Q: Is there a sign anywhere in the casino that notifies patrons that they are not allowed to pick up coins they find in trays?
A: No.

Q: How is that policy at the casino communicated to patrons?
A: We tell them.
Q: And when do you tell them, as they enter the casino?
A: No.
Q: Do you tell them before they pick a coin out of the tray?
A: No.
Q: Do you tell them after they've been found picking a coin out of a tray?
A: Yes.
Dep. of J. Stevenson, 46–47.

whether there was a legal justification for Defendants' arrest of Plaintiff. In short, there are facts sufficient to allow a jury to find for Plaintiff on all five elements of the claim.

By virtue of the fact that Plaintiff can succeed on a claim for false arrest, she may also succeed on a claim for false imprisonment. A jury can find for Plaintiff on her claim of false imprisonment. For the reasons stated in *Section IV. A. 1.* of this Opinion and Order, the Court finds that there are sufficient facts to allow a jury to find that Plaintiff was confined. The Court also finds that there is no dispute that Defendants intentionally confined Plaintiff and, if the jury finds that she was in fact confined, that she was aware of her confinement. The final element is whether there is any legal justification for Plaintiff's confinement; for the reasons stated in the previous paragraph, the Court finds that a jury can find for Plaintiff on this element, too.

Consequently, the Court finds that Plaintiff's claim for false arrest/false imprisonment survives Defendants' motion for summary judgment.

## C. Defamation

■ Plaintiff alleges a claim for defamation. She basically alleges that Defendants defamed her when they accused her of stealing casino property. Under Michigan law, there are four elements in a defamation claim: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; (4) and either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod). *See Kefgen v. Davidson,* 241 Mich.App. 611, 617 N.W.2d 351, 356 (2000).

Defendants raise two arguments as to why this claim should be dismissed: one procedural and one substantive. As for the procedural argument, Defendants argue that all of the elements of a claim for defamation must be specifically pleaded, including the defamatory words. *See Gonyea v. Motor Parts Fed. Credit Union,* 192 Mich.App. 74, 480 N.W.2d 297, 299 (1991). Defendants—relying on cases discussing libel, which is printed defamation, as opposed to slander, which is spoken defamation, and which is the type of defamation at issue here—argue that Plaintiff failed to specifically set forth the facts that her claims rely on, including the "defamatory words" and how these words were "published."

The Court disagrees. This action was originally filed in the Wayne County Circuit Court, and it complies with Michigan Court Rules. In particular, Plaintiff's complaint puts Defendants on notice of the facts that she alleges against them. *See* MICH. CT. R. 2.111(B)(1); *see also Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.,* 197 Mich.App. 48, 495 N.W.2d 392, 395 (1992) (stating that the rationale behind requiring specific pleadings in defamation actions is to put the defendant on notice). While the Court recognizes that Michigan courts, in libel cases, requires that the complaint list " 'the very words of libel,' " *see id.* (citations omitted), this is not a libel case. *See Sullivan v. River Valley Sch. Bd.,* 1997 WL 33344778, *3 (Mich.Ct.App.1997) ("Because libel is written, it must be pleaded verbatim; however, a more generous rule applies to slander because it cannot be retained verbatim.") (citations omitted). Plaintiff's complaint puts Defendants on notice of the claims against them; she alleges that Defendants "made false, malicious and defamatory accusations about Plaintiff, accusing her of committing a crime, to wit stealing Defendant's property." There is no question

that Plaintiff's complaint sets forth sufficient allegations to inform Defendants of her claim against them. Thus, Defendants' procedural argument fails.

■ Defendants' substantive argument fails as well. Defendants argue that they did not make a false statement when they accused Plaintiff of stealing a token; they argue that it is in fact true that Plaintiff stole a token; Defendants also argue that they never published their false statement to a third party. As for the former argument, the Court has already ruled that if the jury finds that the token at issue was abandoned, then Plaintiff had stolen nothing. As for the latter argument, there is deposition testimony that establishes that representatives of the casino, including the named Defendants, had informed Plaintiff's two friends, Ms. Holman and Ms. Dombrowski, that Plaintiff had "stolen" casino property. Defendants argue, without citation to authority, that Plaintiff was the first person to tell her friends that she was arrested for stealing, thus, Defendants cannot be held liable for subsequently telling Ms. Holman and Ms. Dombrowski about the theft. This argument also fails; the gravamen of the harm of slander is that a person's reputation in the eyes of others is reduced. *See Bonkowski v. Arlan's Dept. Store,* 383 Mich. 90, 174 N.W.2d 765, 767 (1970). Even if the third person knows the allegations to be untrue, an action for slander may be maintained. *See id.* In the present action, when Plaintiff first informed her friends that she was accused of stealing from the casino, her friends thought it was a joke. Employees of the casino, however, told Plaintiff's friends that she had stolen from the casino. A jury could find that this affected Plaintiff's reputation amongst her friends, if only for a short period of time.

Thus, there are sufficient facts on each element of a claim for defamation to allow this claim to proceed to a jury. As a result, Defendant's Motion for Summary Judgment on this claim fails.

### D. Intentional Infliction of Emotional Distress

■ Plaintiff's final substantive claim is for intentional infliction of emotional distress. In order to prove a claim for intentional infliction of emotional distress in Michigan, Plaintiff must prove four elements: (1) extreme or outrageous conduct; (2) that intentionally or recklessly; (3) causes; (4) extreme emotional distress. *See Grochowalski v. Detroit Auto. Inter-Ins. Exch.,* 171 Mich.App. 771, 430 N.W.2d 822, 824 (1988).[8] Defendants argue that there are insufficient facts to find that what the individual Defendant security officers did is extreme or outrageous, or that Plaintiff suffered extreme emotional distress. Defendants argue that Plaintiff was merely "embarrassed" by the entire incident, and that the individual Defendant security officers were "merely doing their job."

The Court disagrees. There is sufficient evidence to allow a jury to find that after Plaintiff picked up an abandoned token that Defendants—by using the authority vested in them by the State of Michigan—

---

8. Defendants discuss the history of the tort of intentional infliction of emotional distress in Michigan, and notes that such a tort has yet to be recognized by the Michigan Supreme Court. The Court, however, shall not disregard Michigan Court of Appeals decisions regarding Michigan law unless the Court is convinced that the Michigan Supreme Court would hold otherwise. *See Aetna Cas. & Sur.* *Co. v. Dow Chemical Co.,* 10 F.Supp.2d 771, 777 (E.D.Mich.1998). Although the Michigan Supreme Court has yet to encounter a set of facts that would allow it to find intentional infliction of emotional distress, Defendants have not convinced the Court that the Michigan Supreme Court would not adopt such a tort in the event that it is confronted with the appropriate set of facts.

surrounded her, arrested her, led her to the security office, prevented her from leaving the security office, and stole the five cents that she found from her. Afterwards, they surrounded her as they threw her out of the casino, and refused to let her use the restroom by herself. Defendants also prevented her from having lunch with her friends, falsely told her friends that she had stolen from them, and would not let her enter the casino to get out of the heat. Viewing these facts in the light most favorable to Plaintiff, a jury could certainly exclaim "Outrageous!" *Graham v. Ford,* 237 Mich.App. 670, 604 N.W.2d 713, 716 (1999) (quoting *Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 374 N.W.2d 905, 909 (1985)). Therefore, Defendants' motion for summary judgment shall not be granted as to Plaintiff's claim for intentional infliction of emotional distress.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.