### Willie SMITH, Sr., Plaintiff,

v.

### DETROIT ENTERTAINMENT L.L.C. d/b/a MOTOR CITY CASINO, et al., Defendants.

### No. 03–71688.

United States District Court, E.D. Michigan, Southern Division.

Sept. 23, 2004.

Willie Smith, Pro Se, Newton Falls, OH, for plaintiff.

John B. Farrell, Esq., Detroit, MI, for defendants.

*OPINION AND ORDER ADOPTING, WITH SUPPLEMENTATION, THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE*

ROSEN, District Judge.

## I. *INTRODUCTION*

The above-captioned case is presently before the Court on the August 30, 2004 Report and Recommendation of United States Magistrate Judge Donald A. Scheer recommending that the Court (1) grant Defendant's motion for summary judgment, (2) deny Plaintiff's motion for summary judgment and (3) dismiss Plaintiff's Amended Complaint in its entirety. Plaintiff has timely filed objections to the Magistrate Judge's Report and Recommendation.

Having completed its review of the Magistrate Judge's Report and Recommendation, Plaintiff's objections, and the entire file of this action, for the reasons stated in the Report and Recommendation, and for the further reasons set forth below, the Court finds that Defendant's motion for summary judgment should be granted and this case should, accordingly be dismissed in its entirety.

## II. *PERTINENT FACTS*

The Magistrate Judge's Report and Recommendation sets forth in detail the pertinent facts of this case which the Court adopts and incorporates herein. Briefly, Plaintiff Willie Smith was a gambling patron at the Motor City Casino. On the evening of October 11, 2001, he went to the cashier window to cash in his chips where he was only given $8,323.00. Plaintiff disputed the amount claiming that he was short-changed by the cashier and entitled to $200.00 more than what he was given. Plaintiff was eventually escorted away from the cashier's window by casino security officers and taken to the security office to fill out an incident report where he was advised that the dispute had to be resolved by the Michigan State Police and the Michigan Gaming Control Board. Plaintiff was detained by casino security officers in the security office to await the State Police. Two State Police officers arrived a short while later and questioned Smith about the events of the evening. One of the State Police officers, Detective Frank Little, allegedly told Mr. Smith that he had reviewed the surveillance video of the cashier's window and he thought that Smith had taken two chips away from the counter presenting his winnings. Smith denied that claim and maintained that the casino had cheated him out $200. After a brief period of further questioning, Plaintiff was allowed to leave. Based on these events, Plaintiff sued Motor City Casino and security officer Oscar Brown under 42 U.S.C. § 1983 alleging violation of his

Fourth and Fourteenth Amendment rights.

### III. *LEGAL ANALYSIS*

The Magistrate Judge's Report and Recommendation contains a detailed legal analysis of Plaintiff's claims and the Court adopts and incorporates that analysis herein. The Court supplements that analysis with the following discussion.

To state a viable claim under 42 U.S.C. § 1983, a plaintiff "must allege that he was deprived of a right secured by the Federal Constitution or laws of the United States by a person acting under color of state law." *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992). Where, as here, the defendant is a private party, the "state action" element of a § 1983 claim turns upon "whether the party's actions may be fairly attributable to the state." *Wolotsky,* 960 F.2d at 1335 (internal quotations and citation omitted).

As the Magistrate Judge found, Plaintiff has failed to identify a viable theory of state action under any of the three tests articulated by the Supreme Court. These tests include: (1) the public function test, (2) the state compulsion test, and (3) the symbolic relationship or nexus test. *See Wolotsky,* 960 F.2d at 1335.

### 1. The Public Function Test

■ Under the "public function" test, state action may be found "in the exercise by a private entity of powers traditionally reserved to the State." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974). As Magistrate Judge Scheer noted, "The public function test has been interpreted narrowly," and "[o]nly functions like holding elections, exercising eminent domain, and operating a company-owned town fall under this category of state action." *See Chapman v. Higbee Co.,* 319 F.3d 825,

833–34 (6th Cir.2003) (internal quotations omitted).

■ The Sixth Circuit's *en banc* decision in *Chapman* poses for Plaintiff a considerable obstacle to establishing his claim under this theory of state action. *Chapman,* like this case, involved allegations of illegal search and seizure by a private security guard. Specifically, plaintiff Lynette Chapman was detained and strip searched by a security guard at a department store, based on a suspicion that she had shoplifted merchandise from the store. The Sixth Circuit found that these allegations did not satisfy the public function test. In so ruling, the Court elected to follow the rulings of several other circuits, reading these decisions as uniformly holding "that the mere fact that the performance of private security functions may entail the investigation of a crime does not transform the actions of a private security officer into state action." *Chapman,* 319 F.3d at 834 (citing cases from the Fifth, Seventh, and Tenth Circuits). In particular, the Court quoted with approval from a Fifth Circuit decision holding that the detention of a suspected shoplifter is not an exclusive state function:

> A merchant's detention of persons suspected of stealing store property simply is not an action exclusively associated with the state. Experience teaches that the prime responsibility for protection of personal property remains with the individual. A storekeeper's central motivation in detaining a person whom he believes to be in the act of stealing his property is self-protection, not altruism. Such action cannot logically be attributed to the state.

*Chapman,* 319 F.3d at 834 (quoting *White v. Scrivner Corp.,* 594 F.2d 140, 142 (5th Cir.1979)).

Plaintiff's appeal in this case to the "public function" test runs afoul of this aspect of the ruling in *Chapman*. As the Magistrate Judge found, Plaintiff was detained by casino security personnel on suspicion of an attempted fraud. Under *Chapman*, such self-interested "private security functions" do not satisfy the "public function" test.

The Court is aware that there are other cases in which private security officers were found to have possessed police powers traditionally vested in the state alone. In one such case, *Payton v. Rush–Presbyterian–St. Luke's Medical Center*, 184 F.3d 623, 628–30 (7th Cir.1999), the Seventh Circuit held that two security guards employed at a private medical center in Chicago were state actors under the "public function" test. The guards in question were "special police officers" under a Chicago ordinance, which provided that such officers (i) must be licensed and appointed by the city, (ii) were subject to character investigation by the superintendent of police, (iii) were required to wear badges issued by the police superintendent, (iv) were subject to all rules and regulations governing Chicago police officers, (v) possessed the powers of regular police officers within their places of employment, and (vi) were required to report in person to the superintendent of police as he directed. *Payton*, 184 F.3d at 625. The Court viewed this city ordinance as vesting "broad powers and responsibilities" in the defendant security guards, and concluded that "this ordinance delegates police powers otherwise exclusively reserved to the state, thus making those who act pursuant to it potentially liable under § 1983." *Payton*, 184 F.3d at 630.

In so ruling, the Court distinguished *Payton* from its earlier decision in *Wade v. Byles*, 83 F.3d 902, 905–06 (7th Cir.1996), which held that the private security guard in that case was not a state actor under the "public function" test. In *Wade*, the defendant security guard, Oscar Byles, was employed by a private security firm, T Force Security, which in turn had contracted with the Chicago Housing Authority ("CHA") to provide security in the lobbies of housing projects owned by CHA. CHA was a state governmental entity, and maintained its own police force which, while on CHA property, possessed all of the powers of city or state police officers. In contrast to the broad authority vested in this CHA police force, the powers and duties of the T Force security personnel were much more limited:

> The T Force guards wore uniforms with patches identifying their employer. The guards were armed with handguns and were authorized by T Force to use deadly force only in self-defense. The primary responsibility of T Force guards was to control access to CHA buildings by monitoring the identification of people entering and leaving the buildings. Guests who did not show proper identification or sign in were not allowed to enter the buildings, and T Force guards would ask such people to leave. If a person refused to leave, the guards would call the police, and either wait for the police to remove the person or arrest the person for criminal trespass pending the arrival of the police. Other guard duties included aiding people in the lobby, signing criminal complaints, and appearing in court when needed.
>
> When on duty, T Force guards were responsible only for maintaining security within the immediate lobby areas of CHA buildings. According to T Force policy, guards were not allowed to pursue individuals outside the lobby. Rather, guards were obligated to remain in the lobby area until properly relieved. Moreover, private security guards did not participate in "sweep" searches of

CHA residential units conducted by the CHA police department. The powers of T Force guards were therefore local in nature and limited in scope.

*Wade,* 83 F.3d at 904 (footnote and citation omitted).

Under these circumstances, the Seventh Circuit held that the defendant T Force security guards were not state actors. The Court reasoned:

We are not faced with a situation where a state has delegated its entire police power to a private police force. Indeed, general police protection on CHA property is provided by the CHA police force, which is statutorily entrusted with all powers possessed by the police of cities, and sheriffs .... The contract security guards are not a part of this public police force, nor do they participate in search of residential units conducted by the police. Furthermore, the area of responsibility of the contract guards in this case are clearly limited to the lobbies of CHA buildings.

The duties of a private security guard at a CHA building, however, include more than simply opening doors. Plaintiff correctly asserts that Byles was employed to provide security for CHA residents and was thereby authorized to carry a handgun, arrest people for criminal trespass pending arrival of the police, and use deadly force in self-defense. Although all of these powers have been traditionally exercised by the sovereign via the police, none has been *exclusively* reserved to the police. In fact, as [the plaintiff's] counsel conceded at oral argument, Byles possessed powers no greater than those of armed security guards who are commonly employed by private companies to protect private property. We therefore find that Byles' function as a lobby security guard with the aforementioned limited powers is not

traditionally the exclusive prerogative of the state. The fact that Byles performed his duties on public property, or for the public's benefit, does not make him a state actor. Moreover, CHA's employment of in-house armed security guards with lobby duties identical to those of the contract security guards does not change our conclusion, as this fact does not demonstrate that Byles performed an *exclusive* state function. *Wade,* 83 F.3d at 905–06 (internal quotations, citations, and footnote omitted).

This case has far more in common with *Wade* than with *Payton.* Plaintiff here has not identified any state or local legislation that confers broad police powers upon security personnel. In fact, Michigan's security guard licensing statute limits the powers of security guards. Pursuant to the statute, upon obtaining a license, a private security officer is granted "the authority to arrest a person without a warrant" to the same extent possessed by public police officers, but only when this officer "is on the employer's premises." Mich. Comp. Laws § 338.1080. This authority is further limited to the security guard's "hours of employment as a private security police officer and does not extend beyond the boundaries of the property of the employer." Mich. Comp. Laws § 338.1080.

The limited powers conferred under this statute do not convert private security guards into state actors. This has been confirmed by the definitive arbiter of the proper meaning of this statute, the Michigan Supreme Court. In *City of Grand Rapids v. Impens,* 414 Mich. 667, 327 N.W.2d 278 (1982), the defendant was charged with disorderly conduct as a result of a shoplifting incident at a Meijer store, and he argued that a statement procured by private security guards on the premises should be suppressed as elicited without any *Miranda* warnings. Because

"the exclusionary rule only applies if governmental involvement can be shown," the Court turned to the question whether the private security guards could be deemed state actors. *Impens,* 327 N.W.2d at 280.

The Michigan Supreme Court held that the defendant had not identified any state action that would trigger the requirement of *Miranda* warnings. In so ruling, the Court specifically rejected the defendant's contention that "the licensing statutes which regulate private security guards demonstrate the requisite degree of state action to bring their activities under color of state law, subject to constitutional restraints." 327 N.W.2d at 281. Instead, the Court concluded that "[w]e do not believe that the mere licensing of security guards constitutes sufficient government involvement to require the giving of *Miranda* warnings." 327 N.W.2d at 281.[1] This Court, of course, is bound by the views of Michigan's highest court as to the extent of authority conferred under the Michigan security guard licensing statute.

Even if this Court were writing on a blank slate, however, it could not construe this Michigan statute, standing alone, as conferring sufficient authority to convert a private security guard into a state actor. The arrest authority granted in the statute is narrowly circumscribed, limited to the employer's place of business and the security guard's hours of employment. This is closely analogous to the limited arrest authority possessed by the security guards in *Wade,* and is far removed from the full police powers granted to the security personnel in *Payton.* Indeed, by completing the Michigan licensing process, a private security guard obtains only a modest increase over the authority possessed by an unlicensed security guard—by virtue of

Michigan's common law "shopkeeper's privilege," such a guard may "detain for a reasonable period of time a person suspected of theft or failure to pay." *Impens,* 327 N.W.2d at 281.

This Court recognizes, just as Magistrate Judge Scheer recognized, that Judge Zatkoff of this District reached a contrary result in another case involving casino security personnel. In *Romanski v. Detroit Entertainment, L.L.C.,* 265 F.Supp.2d 835 (E.D.Mich.2003), the plaintiff casino patron was detained for 45 minutes to an hour and then escorted out of the casino for having taken a five-cent token out of the tray of an abandoned slot machine. The security guards who had detained the plaintiff were licensed under the above-cited Michigan statute, and thus had the power to make arrests within the casino and during their work hours. Relying principally on the guards' licensed status under Michigan law, Judge Zatkoff held that the plaintiff had satisfied the "public function" test of state action. In particular, the Court reasoned that "a security guard that exercises authority that is traditionally reserved to the State, ... such as the power to arrest, is a state actor acting under the color of state law." *Romanski,* 265 F.Supp.2d at 843.

This Court is not prepared to go quite so far as Judge Zatkoff in finding that a limited power to arrest should be deemed a "public function" that traditionally has been reserved exclusively to the state. The decision in *Wade,* for one, indicates otherwise, as the limited arrest authority possessed by the security guards in that case was held ***not*** to be a power "*exclusively* reserved to the police." *Wade,* 83 F.3d at 906. As noted by the Seventh

---

1. In reaching this conclusion, the Court specifically disagreed with the Court of Appeals earlier decision in *People v. Eastway,* 67 Mich. App. 464, 241 N.W.2d 249 (1976). *See Impens,* 327 N.W.2d at 281.

Circuit in that case, even private citizens traditionally have a limited power of arrest.

Finally, under controlling Sixth Circuit precedent, a private security guard's detention of a customer to advance the business interests of his employer is not a "function exclusively reserved to the State." *Chapman*, 319 F.3d at 834.[2] Absent at least some of the additional factors that were present in *Payton*, such as the grant of full police powers, direct supervision by government law enforcement officials, or the obligation to comply with the rules and regulations governing regular police officers, the Court does not believe that a security guard's limited power to arrest or detain a business invitee on his employer's premises satisfies the "public function" test of state action.

## 2. The State Compulsion Test

■ The "state compulsion" test of state action warrants little discussion in this case. "The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky*, 960 F.2d at 1335. "More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives." 960 F.2d at 1335.

While it is true that state police officers were involved in the events about which Plaintiff complains, nothing in the record establishes that the state police exercised control over the casino's security personnel or its policies.

## 3. The Symbiotic Relationship or Nexus Test

■ The final test of state action is the "symbiotic relationship" or "nexus" test. Under this test, "a section 1983 claimant must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Chapman*, 319 F.3d at 834. Plaintiff's argument on this point, in essence, is that Defendant's casino is so thoroughly regulated by the state that the operations and activities of Defendant's private security force must be viewed as closely entwined with the apparatus of the state.

*Chapman* once again provides significant guidance in the Court's consideration of this issue. Although the Sixth Circuit held that the "public function" test was not satisfied in that case, it ruled that state action could be found under a "symbiotic relationship" theory. The Court explained:

Here, the Dillard's security officer who stopped and searched Chapman was an off-duty sheriff's deputy, wearing his official sheriff's department uniform,

**2.** *Romanski* seeks to distinguish *Chapman* by drawing a distinction between "a security guard that is merely exercising common law rights, such as detaining individuals who are suspected of theft," and a "security guard that exercises authority that is traditionally reserved to the state, ... such as the power to arrest." *Romanski*, 265 F.Supp.2d at 843. This proposed distinction, however, results in a jury question whenever a licensed security guard detains a customer in a manner that could be construed as more akin to an "arrest" than a "detention." Although the "state action" inquiry can sometimes turn on such fact-specific, case-by-case issues, *see Chapman*, 319 F.3d at 834, this Court believes that the "public function" test of state action, at least, should be governed by broader considerations of the nature of powers "traditionally reserved exclusively to the state," *Chapman*, 319 F.3d at 833.

badge, and sidearm. Moreover, the Dillard's security officer was obligated to obey Dillard's policies and regulations while on-duty at the store. Although the state played no part in the promulgation of these policies, their strip searching provision directly implicates the state: "Strip searches are prohibited. If you suspect that stolen objects are hidden on [the shopper's] person, call the police."

During the incident at issue, the Dillard's security officer did not represent himself as a police officer, threaten to arrest Chapman, wave his badge or weapon, or establish any contact with the sheriff's department. He did however initiate a strip search by requiring Chapman to enter a fitting room with the sales manager to inspect her clothing. Because Dillard's policy *mandates* police intervention in strip search situations, a reasonable jury could very well find that the *initiation of a strip search* by an armed, uniformed sheriff's deputy constituted an act that may fairly be attributed to the state. Additionally, if Chapman did not feel free to leave, as a result of the security officer's sheriff's uniform, his badge, or his sidearm, a reasonably jury could find the detention was a tacit arrest and fairly attributable to the state.

319 F.3d at 834–35 (footnote omitted).

 The incidents alleged in Plaintiff's complaint are readily distinguishable from the situation which led the Sixth Circuit to find the symbiotic relationship test satisfied in *Chapman*. The security guards involved in the encounters with Plaintiff were not off-duty officers, and could not reasonably have been perceived as police officers. Although they may have worn uniforms and badges, the Court notes that Michigan's security guard licensing statute mandates that these uniforms and insignia

"shall not deceive or confuse the public or be identical with that of a law enforcement officer of the federal government, state, or a political subdivision of the state in the community of the license holder." Mich. Comp. Laws § 338.1069(1). Plaintiff here has not alleged that the casino security personnel in this case created the impression, through their appearance at least, that they possessed state-sponsored police powers.

Plaintiff relies upon a provision of the Michigan Commission Regulations which sets minimum requirements for detention facilities on casino premises. The section of the law cited by Plaintiff includes a provision requiring the thorough search of a detained person. It also requires that the casino licensee immediately report the detention of a person suspected of criminal activity to the Michigan State Police. *See* Mich. Admin. Code R. 432.11003. However, as the Magistrate Judge observed, this regulation does not compel the detention itself. That right is derived from the common law. Moreover, the requirement for immediate reporting of any detention to the Michigan State Police clearly shows the distinction between the casino's right of detention from the traditional "state action" of criminal investigation and arrest. Defendant's compliance with the requirements of the Michigan Gaming Commission Regulations was not a usurpation of state government authority but rather, a submission to it. Indeed, the security officers' early and complete deference to the authority of the State Police serves to demonstrate the private and limited character of their own authority.

*CONCLUSION*

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the Magistrate Judge's Report and Recommendation of August 30, 2004, as supple-

mented herein, is accepted and adopted by this Court.

IT IS FURTHER ORDERED that, for the reasons set forth in the Magistrate Judge's Report and Recommendation and for the further reasons set forth in this Opinion and Order, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. Accordingly, Plaintiff's Complaint is DISMISSED, in its entirety, with prejudice.

Let Judgment be entered accordingly.

## JUDGMENT

The Court having this date entered an Opinion and Order adopting, with supplementation, the Magistrate Judge's August 30, 2004 Report and Recommendation, granting Defendant's Motion for Summary Judgment and denying Plaintiff's Motion for Summary Judgment, and being otherwise fully advised in the premises,

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Plaintiff's Complaint is DISMISSED with prejudice.

## REPORT AND RECOMMENDATION

SCHEER, United States Magistrate Judge.

## I. RECOMMENDATION:

I recommend that Plaintiff's Motion for Summary Judgment be denied and that

Defendants' Motion for Summary Judgment be granted.

## II. REPORT:

### A. Procedural History

On October 15, 2002, plaintiff filed this action in the United States District Court for the Northern District of Ohio. His Complaint named John Doe, Detroit Entertainment LLC, d/b/a Motor City Casino (hereinafter "Motor City"), Frank Little and the Michigan Gaming Control Board as defendants. On December 18, 2002, the case was transferred by consent of the parties to the docket of United States Magistrate Judge James S. Gallas. In a Memorandum Opinion on April 15, 2003, Magistrate Judge Gallas dismissed plaintiff's claims against the Michigan Gaming Control Board and Frank Little, a Michigan State Police officer, in his official capacity, on the basis of the 11th Amendment immunity. Plaintiff's claims against Little in his personal capacity were also dismissed, on qualified immunity grounds. On the same day, Magistrate Judge Gallas entered a Memorandum Opinion and Order transferring the balance of plaintiff's case to the docket of this court.

Following the docketing of the case in this jurisdiction, plaintiff was granted leave on two occasions to amend his Complaint for the purpose of identifying the "John Doe" defendants. Motor City Casino security officers Oscar D. Brown and Emmett Frederick were thus added as defendants.[1] Appearances were filed for

1. The First Amended Complaint named Motor City Casino security guard Leon Griffin as a defendant. the Second Amended Complaint, filed on January 5, 2004, omitted Griffin and added security guard Emmett Frederick in his place. The docket sheet does not reflect that Frederick has been served with Summons and Complaint, and the claims against him are subject to dismissal under Fed.R.Civ.Pro.

4(m). The Second Amended Complaint also names Frank Little and the Michigan Gaming Control Board as defendants. Those parties had previously been named in the Ohio Complaint, and plaintiff's claims against them had been dismissed by Magistrate Judge Gallas. Neither has been served with Summons or Amended Complaint in this action, and the Second Amended Complaint raises no claim

Motor City and Brown. Both plaintiff and the defendants have filed Motions for Summary Judgment. The motions were argued on June 24, 2004.

### B. *Applicable Law and Standard of Review*

To prevail on a Motion for Summary Judgment, the moving party must meet the initial burden of showing an absence of any genuine issue of material fact as to an essential element of the non-moving party's case. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford and Company,* 886 F.2d 1472, 1479 (6th Cir.1989). The burden then shifts to the non-moving party to demonstrate by Affidavits, depositions, Answers to Interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548. The non-moving party may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact. *Street,* 886 F.2d at 1479. "The non-moving party must come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In determining whether a genuine issue of material fact has been raised, the court must construe all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 257–58, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inferences drawn must be justifiable or reasonable. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. But, [n]ot every issue of fact or conflicting inference presents a genuine issue of material fact which requires the denial of a summary judgment motion.

*Street,* 886 F.2d at 1477. Rather, the court may weigh competing inferences for their persuasiveness. The non-moving party "must do more than show that there is some metaphysical doubt as to the material fact." Where the record taken as a whole could not lead a trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348.

### C. *Factual History*

The following fact summary is based upon Plaintiff's Motion for Summary Judgment and his Response to Defendant's Motions for Summary Judgment.

On October 11, 2001, Mr. Smith was a gambling patron at the Motor City Casino in Detroit, Michigan. Plaintiff went to the cashier window to cash in his chips. He expected to receive $8,523.00 in cash, but was told by the cashier that only $8,323.00 in chips had been presented. A casino manager intervened in the resulting dispute. She advised plaintiff that a review of his play at the craps table would be conducted, and told him that a decision would be made based upon that review. Some time later, the manager (Schmitz) came back to the cashier's window with another manager (Kerns) and security guards. The second manager informed plaintiff that the casino was only willing to pay $8,323.00. He gave plaintiff a Michigan Gaming Control Board "Patron Dispute Form" and told him that he could file a complaint with that agency, whose office on the casino premises was closed at that time. Plaintiff maintains that the manager (Kerns) then requested that he follow the security officers to the security office to fill out a Motor City Casino "Security Incident Report." Plaintiff agreed, and he and his

which would not be barred by reason of Magistrate Judge Gallas' decision. Accordingly, this Report and Recommendation will address only the claims against Detroit Entertainment LLC and Brown.

wife were escorted to the security department by defendant Oscar Brown a private security officer for the casino. They arrived there at approximately 12:57 a.m. on October 12, 2001. Brown instructed plaintiff to move to the rear of the counter located at the front entrance of the security department. He made reference to a room across the way where plaintiff would have a table and chair for his use in filling out the incident report. As plaintiff passed behind the counter, Brown stepped between him and his wife. At that point, plaintiff became suspicious and, after noting restraint devices attached to the wall of the designated room, he refused to enter. He was told by Emmett Fredericks, Security Shift Manager for Motor City that the dispute had to be resolved by the Michigan State Police and the Gaming Board, and that plaintiff must remain there until they released him. That occurred at approximately 1:05 a.m. He was then escorted to a different room and instructed to sit down. At that point, plaintiff's wife began to experience physical discomfort. Plaintiff attempted to go to her, but alleges that Brown blocked his way and threatened him with harm if he did not take a seat. Plaintiff was asked for his identification, but refused to produce it to the security officers. Defendant Brown then searched him, emptying his pockets and belongings onto a table in the room.

At approximately 1:46 a.m. on the morning of October 12, 2001, Michigan State Police detectives Frank Little and Brad Washburn entered the room in which plaintiff was seated and identified themselves. The two officers questioned plaintiff about the events of the evening. In response to questioning, plaintiff denied having requested to see the Michigan State Police and stated that he had already obtained the dispute resolution form and would have been on his way back to Ohio if he had not been detained. Detective Lit-

tle allegedly told plaintiff that he had reviewed the surveillance video of the cashier's drawer, and he thought that plaintiff had taken two chips away from the counter after presenting his winnings. Plaintiff denied that claim, and maintained that the casino had shortchanged him. After a brief period of questioning, he was allowed to leave. A security guard escorted plaintiff to the main lobby of the casino, where he arranged for a taxi to take him to Ford Hospital, where his wife had been taken. While waiting for the cab, plaintiff became ill, and he was transported to the hospital by ambulance.

### D. *Analysis*

Based on the events of October 11–12, 2001, plaintiff has brought suit against Motor City Casino and Brown under 42 U.S.C. § 1983. He alleges that his 4th Amendment rights to be free from unreasonable search and seizure, and his 14th Amendment rights to due process and equal protection under the law were violated by the defendants.

42 U.S.C. § 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (1998).

There are two essential elements to a § 1983 action. First, the conduct complained of must be committed by a person acting under the color of state law. *Par-*

*ratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Second, this conduct must have deprived the plaintiff of the rights, privileges, or immunities guaranteed by the U.S. Constitution or the laws of the United States. *Id.* See also, *Moralez v. Thiede,* 828 F.Supp. 492, 493 (E.D.Mich.1993); *Dubuc v. Green Oak Tp.,* 810 F.Supp. 867, 872 (E.D.Mich.1992). An essential inquiry in this case, therefore, is whether or not defendant Brown, as a security guard in the employ of defendant Motor City, a state licensed casino, can be held to have acted "under color of law" for purposes of § 1983. *Chapman v. Higbee Co.,* 319 F.3d 825, 833 (6th Cir.2003), quoting *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992). If not, the § 1983 claim against both defendants must be dismissed.

A private party's conduct constitutes state action under § 1983 where it may be "fairly attributable to the state." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 947, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). To identify those actions that are attributable to the state, the Supreme Court has formulated three tests: 1) the public function test, 2) the state compulsion test and 3) the symbiotic or nexus test. *Chapman,* 319 F.3d at 833, citing *Wolotsky,* 960 F.2d at 1335 (internal citations omitted).

### 1. *Public Function Test*

Under the public function test, a private party is deemed a state actor if he exercises the powers traditionally and exclusively held by the state. *Chapman v. Higbee Co.,* 319 F.3d at 833. The test has been interpreted narrowly, and only a small range of functions has been held to confer "state actor" status upon private parties. Those functions include holding elections, see *Flagg Bros. v. Brooks,* 436 U.S. 149,

157–58, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); exercising eminent domain, see *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352–53, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); and operating a company owned town, see *Marsh v. Alabama,* 326 U.S. 501, 505–09, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In *Chapman,* the Sixth Circuit, following the lead of several other circuit courts, concluded that a private security officer was not performing a public function when she stopped and searched the plaintiff, a patron of the officer's merchant employer, based upon suspicion of shoplifting. The court held that the no state action had occurred under the criteria of the public function test. *Chapman,* at 834. Adopting the reasoning of the Fifth Circuit in *White v. Scrivner Corp.,* 594 F.2d 140 (5th Cir.1979), the court held that a merchant's detention of persons suspected of stealing store property is not an action exclusively associated with the state. "Experience teaches that the prime responsibility for the protection of personal property remains with the individual. A storekeeper's central motivation in detaining a person whom he believes to be in the act of stealing his property is self protection, not altruism. Such action cannot logically be attributed to the state." 319 F.2d at 834. The same analysis compels an identical result in this case. The detention and search of plaintiff by private security personnel employed by a casino, on suspicion of an attempted fraud, is not an action exclusively associated with the state, but rather a private gesture of common law self protection which cannot logically constitute state action.

### 2. *State Compulsion Test*

Under the State Compulsion Test, the conduct of a private individual may be determined to be under color of law under circumstances in which "the state, by its law, has compelled the act." *Adickes v.*

*S.H. Kress and Co.*, 398 U.S. 144, 170, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Under circumstances in which the state has in effect "commanded a particular result" the actions of a private party consistent with that command may support the conclusion that he is a "state actor." The test is satisfied when the state's actions involve coercion or a significant level of encouragement of the alleged constitutional violation. More than mere approval or acquiesce in the initiatives of the private party is necessary to hold the state responsible for those initiatives. The level of coercive power, or encouragement, either overt or covert, must be such that, in law, the choice of the private actor is deemed to be that of the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir.1992) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)).

Plaintiff has neither alleged nor demonstrated that the security guards at Motor City Casino were working in concert with the Michigan State Police, or that they were compelled to detain plaintiff at the behest of the State of Michigan. Extensive state regulation of a private industry does not, in itself, render its actions attributable to the state. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (extensive regulation of utility by state does not render its action in discontinuing service to customer for non-payment state action). Defendants have cited several additional federal circuit court cases holding conclusively that private conduct in compliance with state rules and regulations is not, by that fact alone, "state action." Even if that were not the case, plaintiff has pointed to no state law or regulation which compelled defendants to detain casino patrons suspected of unlawful conduct. Thus, I conclude that the state compulsion test has not been met.

### 3. *Symbiotic/Nexus Test*

Under the symbiotic or nexus test, a § 1983 claimant must demonstrate a sufficiently close connection between the government and the private party, such that the conduct of the private party can be fairly attributable to the state itself. *Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir.2003). A challenged activity may be considered state action when "it is entwined with government policies or when government is entwined in [its] management or control." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Whether or not an action is attributable to the state under the symbiotic/nexus test is a fact specific issue, and is determined on a case by case basis. *Chapman*, 319 F.3d at 834. State action might be found, for example, if plaintiff could show that Motor City and the Michigan State Police were acting in concert; or that Motor City had a custom of detaining individuals while the police came to arrest them without conducting an independent investigation. See, *Smith v. Brookshire Bros.*, 519 F.2d 93, 94 (5th Cir.1975). Conversely, when security officers detain a suspect and duly constituted police officers make an arrest after conducting their own independent investigation, a finding of no state action would be justified. See, *Cruz v. Donnelly*, 727 F.2d 79 (3rd Cir.1984).

Plaintiff argues that, because the Motor City Casino is licensed through the State of Michigan Gaming Control and Revenue Act, the actions of its employees can be attributable to the State. I disagree. "The mere fact that a business is subject to state regulation does not by itself convert its action into that of the state." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The critical question is "whether there is a sufficiently close nexus between

the state and the challenged activity of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* at 351, 95 S.Ct. 449. The Sixth Circuit has addressed that question under various factual settings and has found that "state action" is not an inevitable result of attempts to regulate private activity. See, *Northrip v. Federal National Mortgage Association,* 527 F.2d 23, 28 (6th Cir.1975) (regulation of mortgage foreclosures); *Wittstock v. Mark A. Van Sile, Inc.,* 330 F.3d 899 (6th Cir.2003) (purchaser in regulated tax sale not a state actor). It is important to note that the regulated conduct in the case at bar is commercial gambling and not crime control. As recognized in *Chapman v. Higbee Company,* the majority of federal circuits, including our own, hold the view that a merchant's detention of persons suspected of a property crime against it is not an action exclusively associated with the state. The common law of nearly every jurisdiction permits a private party victim of a theft attempt to detain the perpetrator for the police. The courts of Michigan are no exception. *City of Grand Rapids v. Impens,* 414 Mich. 667, 675, 327 N.W.2d 278 (1982). The mere fact that the performance of private security functions may entail the investigation of crime does not transform the action of private security officers in to state action. *Chapman,* 319 F.3d at 834.

Plaintiff cites a provision of the Michigan Gaming Control and Revenue Act which sets minimum requirements for detention facilities on casino premises. The cited section includes a provision requiring the thorough search of a detained person. It also requires the casino licensee to immediately report the detention of a person suspected of criminal activity to the Michigan State Police. Mich. Admin. Code R. 432.11003. The cited regulation, however, does not compel the detention itself. That

right is derived from the common law. Furthermore, the requirement for immediate reporting of any detention to the Michigan State Police clearly differentiates the limited private right of detention from the traditional "state action" of criminal investigation and arrest.

Plaintiff argues as well that the defendants must be considered state actors because the casino "by and through the actions of its employees was clothed with the authority of the State of Michigan when plaintiff was detained and search [sic] in the security department ...." (Plaintiff's Response to Defendants' Motion for Summary Judgment, page 11). That position might appear to be supported by a decision of this court in *Romanski v. Detroit Entertainment, LLC, et al.,* 265 F.Supp.2d 835 (E.D.Mich.2003). In that case, Judge Zatkoff ruled that Motor City Casino security personnel were state actors in connection with their detention and subsequent expulsion (without official city, county or state police intervention) of a patron from the casino premises. The judge found that the individual defendants were properly licensed security officers vested with police powers pursuant to M.C.L. §§ 338.1079, 1080. He declared that "[a] number of federal courts have confronted this question ... and have held that a private security guard is a state actor when he or she is *vested* with the authority of a police officer." 265 F.Supp.2d at 841–42. (emphasis added).

To the extent that the *Romanski* decision stands for the proposition that the mere *possession* of police powers renders any conduct of the possessor a state actor, I believe it is wrongly decided. It is the *exercise,* and not the mere possession of police powers derived from the state that renders the possessor a "state actor." That proposition is established in the law

of the Sixth Circuit as well as that of the State of Michigan.

In *Chapman v. Higbee Co.,* 319 F.3d 825 (6th Cir.2003) (en banc), the Sixth Circuit decided that a private department store security guard who suspected the plaintiff of theft from his employer, and who detained him on store premises for purposes of investigation, was not thereby transformed into a state actor. (See discussion in Paragraph D1, above). It is important to note that the security guard in question was an off-duty sheriff's deputy, and thus vested with broad police powers derived from the state. Nonetheless, the court found that his actions toward the plaintiff store patron was not an *exercise* of his official policy authority, but merely a private act of self-protection on behalf of the merchant employer.

In *City of Grand Rapids v. Impens,* 414 Mich. 667, 327 N.W.2d 278 (1982), the Michigan Supreme Court ruled that private security guards employed by a retail store who detained an individual they suspected of shoplifting were not "state actors," because they were simply exercising the common law right of a merchant to detain an individual suspected of theft. The court declared that the "security personnel were working with the view of furthering their employer's interest only; they were not acting as police agents. Their role may be viewed as an extension of the common law storekeeper's privilege to detain for a reasonable period of time a person suspected of theft or failure to pay." *Impens,* 414 Mich. at 675, 327 N.W.2d 278. One of the security guards involved in the conduct challenged in the *Impens* case was also an off-duty deputy

sheriff. While he aided in the apprehension of the plaintiff and his companions, he identified himself as a store employee.[2] The court determined that his presence during the challenged activities was "not a sufficient relationship to invoke the 'color of law' theory . . . ." 414 Mich. at 677, 327 N.W.2d 278.

The *Romanski* decision declares that the court's holding is fully consistent with the holdings in *Chapman* and *Impens.* In my view, however, neither of those decisions is consistent with the proposition that the mere possession of police powers renders a private security guard a "state actor."

The court in *Romanski* also found that the security guards in that case engaged in conduct which exceeded a storekeeper's detention rights under common law. The facts marshaled by Judge Zatkoff in support of his conclusion included: a) one security guard lifting her jacket to show plaintiff her security badge as well as her handcuffs; b) the presence of "a number" of security officers during plaintiff's detention; c) the wearing of a security guard uniform by one officer; d) the close proximity of four security guards while plaintiff was made to sit at a table in the security office; e) the taking of plaintiff's photo and the copying of her driver's license and social security card; f) the statement of one security officer that she was a "policewoman;" g) defendants' refusal to permit plaintiff to see her friends for lunch; h) the plaintiff's detention for 45 to 60 minutes; and h) plaintiff's exclusion by security personnel from the casino premises. In my view those facts do not amount to an

---

**2.** The court noted that the off-duty sheriff's deputy did not actually secure the challenged confession which was made without *Miranda* warnings. That incriminating statement, however, was the product of the apprehension in which the deputy did participate.

Had his mere possession of police powers derived from the state rendered him a "state actor," his participation in the seizure would have tainted the confession which resulted from it.

exercise of general police powers attributable only to the state. Display of the badge, uniform and accoutrements of a private security guard is fully consistent with the conduct reasonably to be expected of a *private* security guard. Investigative detention and exclusion from private property are thoroughly consistent exercises of a storekeeper's common law right of self protection. The declaration by one certified under M.C.L. § 338.1079 that she is a "policewoman," is fully consistent with the statutory language, which refers to such persons as "private security *police.*" M.C.L. § 38.1079. (Emphasis added). As stated in earlier portions of this Report, Michigan Gaming Commission regulations cited by plaintiff require that a person detained by a private casino security unit be thoroughly searched. Photographing a detainee, and copying her identification, are both reasonable aspects of an investigation, and do not transform the encounter into an exercise of police powers derived from the state.

Even if *Romanski* can be justified on its particular facts, the case at bar is clearly distinguishable.[3] In this case, Mr. Smith was suspected of attempting to defraud the casino in the amount of $200.00. Casino managers and casino personnel initiated an investigation, which included a review of the surveillance tape. Plaintiff was requested to accompany defendants to the casino security office, and he agreed. Upon his arrival, he was told that he was being detained pending a Michigan State Police investigation. He was searched and detained by casino personnel until Michigan State Police Detective Frank Little and his partner arrived. Upon completion of the independent State Police investigation, plaintiff was released, and ultimately transported to the hospital. (See Affidavit of Willie Smith, Sr., Exhibit A to Plaintiff's Motion for Summary Judgment). Based on those facts, I conclude that defendant Brown and his fellow security officers were not exercising police powers conferred by the state, but were simply exercising their employer's common law right to detain a person who was believed to have attempted to defraud the casino. There is no evidence that the individual defendants misrepresented their status as private security guards, or that plaintiff was not fully cognizant of their private status. Michigan Gaming Regulations do not require that a person suspected of theft be detained. If that common law right is exercised, however, the regulations do require a thorough search of the suspect, and an immediate report to the Michigan State Police Mich. Admin. Code R. § 432.11003. Defendants' compliance with the requirements of the Gaming Commission Regulations was not a usurpation of state government authority, but a submission to it. Their early and complete deference to the authority of the State Police serves to demonstrate the private and limited character of their own authority.

Based upon my review of this record, I find that no question of material fact exists as to an essential element of the plaintiff's case. Based upon the facts as presented by plaintiff, and construing all reasonable inferences in his favor, I find that the record as a whole could not lead a trier of fact to find that the defendants acted under color of law in connection with plaintiff's detention. Such a finding is an essential element of a claim under 42 U.S.C. § 1983. Accordingly, I recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendants' Motion for

---

**3.** *Romanski* is currently before the U.S. Court of Appeals for the Sixth Circuit (Case No. 04– 1354).

Summary Judgment be granted; and that the Second Amended Complaint be dismissed with prejudice.

### III. *NOTICE TO PARTIES REGARD-ING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Smith v. Detroit Federation of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987), *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

### PROOF OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Report and Recommendation was served upon the attorneys of record or parties appearing in *pro per* in the above cause by mailing the same to them at their respective address with post-age fully prepaid thereon, on this 30th day of August, 2004.

Dated Aug. 30, 2004.