GRAND RAPIDS v IMPENS

Docket No. 66378. Argued January 5, 1982 (Calendar No. 10).—Decided December 7, 1982.

Frederick G. Impens was convicted by a jury in the 61st District Court, Donald A. Johnston, J., of disorderly conduct under the Grand Rapids City Code. The charge arose out of shoplifting which took place in a department store and was witnessed by store guards. The guards asked the defendant and his accomplices to accompany them voluntarily to their office. The men complied and were questioned by the guards who completed a form statement relative to the shoplifting. The statement was read to the defendant, and was signed by him. The defendant's motion prior to trial to suppress the statement on the ground that he had not been advised of his constitutional rights before giving the statement was denied. The conviction was affirmed by the Kent Circuit Court, George V. Boucher, J. The Court of Appeals, V. J. Brennan, P.J., and J. H. Gillis and N. J. Kaufman, JJ., denied leave to appeal (Docket No. 52118). The defendant appeals.

In an opinion by Chief Justice Fitzgerald, joined by Justices Williams, Coleman, and Ryan, the Supreme Court held:

Inculpatory statements made by a defendant to private retail security personnel who do not act at the instigation of the police and who function without the assistance and cooperation of police officers need not be preceded by warnings of the defendant's constitutional rights to enable the statements to be admitted into evidence against the defendant during a trial.

1. The Supreme Court of the United States has established a conclusive presumption that all confessions or admissions made during a period of custodial interrogation are compelled in

REFERENCES FOR POINTS IN HEADNOTES

[1-6] 21A Am Jur 2d, Criminal Law §§ 791-797.
   29 Am Jur 2d, Evidence §§ 324, 555-557.
[2, 6] 50 Am Jur 2d, Larceny, § 151.
What constitutes "custodial interrogation" within rule of Miranda v Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.
[4] 70 Am Jur 2d, Sheriffs, Police, and Constables § 22.

violation of the Fifth Amendment privilege against self-incrimination. The presumption can be overcome only by demonstrating that the defendant received specific warnings of his rights and that he voluntarily, knowingly, and intelligently waived them. Statements obtained absent these procedural safeguards may not be used in any proceeding against the defendant. The constitutional protections apply to governmental action only, however. A person who is not a police officer or who does not act in concert with or at the request of police authorities is not required to extend constitutional warnings prior to eliciting incriminating statements.

2. In this case, the store security personnel were working with the view of furthering their employer's interest only. Their role may be viewed as an extension of the shopkeeper's common-law privilege to detain for a reasonable period of time a person who is suspected of theft or failure to pay. There was no complicity with the police department or any indication that the acts of the guards were instigated or motivated by police officers. The mere fact that the Private Security Guard Act provides for licensing of private guards does not constitute sufficient government involvement to require warnings relative to constitutional rights before statements are taken. Nor does the fact that one of the guards was an off-duty deputy sheriff from another county provide a sufficient relationship to bring the guards' activity under color of state law. Although the deputy observed the activities of the men and aided in their apprehension, the defendant's statement was obtained by another guard, and the deputy identified himself to the defendant only as a store employee.

Affirmed.

Justice Kavanagh, joined by Justice Levin, dissented. They would hold that statements by a defendant which were obtained by private security personnel in a custodial setting must be preceded by advice of the defendant's constitutional rights to be admissible in a subsequent criminal prosecution.

1. Statements made by a defendant to police officers during a custodial interrogation may not be used in a prosecution of the defendant unless it can be demonstrated that procedural safeguards effective to secure the right against self-incrimination were used.

2. The performance by private security personnel of functions which traditionally are governmental in nature is tantamount to state action. A retail store guard who does more than protect his employer's property full time, who pursues, apprehends, and detains criminals, who performs custodial searches and

seizures and preserves evidence, and who interrogates and refers the criminals for prosecution is performing a police function. Statements obtained by guards under such circumstances must be preceded by advice of the defendant's constitutional rights to be admissible as evidence.

OPINION OF THE COURT

1. CRIMINAL LAW — EVIDENCE — CONFESSIONS — PRIVATE GUARDS — CONSTITUTIONAL LAW — WARNINGS.

Inculpatory statements made by a defendant to private retail security personnel who neither act at the instigation of police officers nor function with their assistance or cooperation may be admitted into evidence against the defendant although the defendant was not warned of his constitutional rights before making the statements.

2. CRIMINAL LAW — EVIDENCE — CONFESSIONS — PRIVATE GUARDS — CONSTITUTIONAL LAW — WARNINGS.

Apprehension and detention of shoplifting suspects and elicitation of incriminating statements of one of the suspects by private store security personnel with the view of furthering the store's interest and not in compliance with instructions by the police was an extension of a shopkeeper's common-law privilege to detain for a reasonable period of time a person who is suspected of theft or failure to pay, and did not require warnings relative to the suspect's constitutional rights to enable the statements to be used during the suspect's trial.

3. CRIMINAL LAW — CONFESSIONS — PRIVATE GUARDS — CONSTITUTIONAL LAW — WARNINGS.

The Private Security Guard Act, which requires the licensing of guards, does not demonstrate the requisite degree of state action to bring the activities of guards under color of state law so as to subject their activities to constitutional restraint and to require guards to give suspects warnings of their constitutional rights before eliciting inculpatory statements, and especially does not subject the activities of private police who are employed to protect the property and employees of their employer to constitutional restraint because such guards need not be licensed under the act (MCL 338.1051 *et seq.,* 338.1079; MSA 18.185[1] *et seq.,* 18.185[29]).

4. CRIMINAL LAW — CONFESSIONS — PRIVATE GUARDS — DEPUTY SHERIFFS — CONSTITUTIONAL LAW — WARNINGS.

Participation by an off-duty deputy sheriff from another county, employed as a private guard, with other guards in the appre-

hension and detention of a shoplifting suspect did not provide a sufficient relationship so as to bring the activities of the guards under color of state law and require warnings of the suspect's constitutional rights before eliciting inculpatory statements by the suspect where the deputy did not obtain the statements and identified himself to the suspect only as a store employee.

DISSENTING OPINION BY KAVANAGH, J.

5. CRIMINAL LAW — EVIDENCE — CONFESSIONS — PRIVATE GUARDS — ADVICE OF RIGHTS.

   *Statements made by a defendant to private retail security personnel in a custodial setting must be preceded by advice of the defendant's constitutional rights to be admissible in a subsequent criminal prosecution.*

6. CRIMINAL LAW — EVIDENCE — CONFESSIONS — PRIVATE GUARDS — ADVICE OF RIGHTS.

   *Apprehension and detention of shoplifting suspects and elicitation of incriminating statements from one of the suspects without prior advice of the suspect's constitutional rights by private retail store security personnel were acts of substitute police officers and not merely of private guards engaged in the protection of private property, thus, the statements were inadmissible as evidence in a subsequent prosecution of the suspect.*

City of Grand Rapids Department of Law, *Philip A. Balkema,* City Attorney, and *Julie Ann Woods,* Assistant City Attorney, for the city.

*Saukas, Bush, Idema & Mitus, P.A.* (by *Karl V. Bush* and *Michael L. Idema*), for defendant.

FITZGERALD, C.J. We are asked to determine whether a signed statement procured by private security guards, one of whom was an off-duty deputy sheriff, may be admitted into evidence against a defendant even though no *Miranda*[1] warnings were given. We hold that no such warnings were necessary in this case and affirm the decision of the Kent Circuit Court.

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

Defendant, Frederick Impens, was charged with disorderly conduct on the basis of a shoplifting incident at a Grand Rapids Meijer store. While walking through the store, security detective Rick Cain, an off-duty deputy sheriff from neighboring Allegan County, observed defendant and his two companions, Allen Raush and David Ronkema, in the musical tape aisle. Believing their behavior to be suspicious, Cain proceeded to the milk cooler, a vantage point from which activity in the tape aisle could be viewed. Charles Booth, another store detective, was already there and had observed one of the men concealing a tape on his person. Booth testified that he observed Allen Raush picking up tapes, removing the packaging, and concealing the tapes inside his pants. Frederick Impens and David Ronkema were observed looking around, walking up and down the tape aisle, selecting tapes, and handing them to Mr. Raush.

Cain and Booth followed the three men after they left the tape aisle and proceeded to different areas in the store. The security guards approached defendant and his companions and asked them to come to the security office. Some identification was shown, though Cain could not recall whether he showed his Meijer identification or his badge.

The officers were joined in the office by a third security guard, and the three men were searched. The tape cartridges and a watchband were found in Raush's possession. The security guards proceeded to talk to the three, eliciting the necessary information to complete Meijer's form entitled "Loss Prevention Department Voluntary Statement". The statement was read to the defendant, and he signed it. There was no indication that defendant would not be released if the statement were not signed. The Grand Rapids police were

called. The police arrived, issued appearance tickets to Impens, Raush and Ronkema, and the three men left the security office. Charles Booth testified that they were in the security office for approximately 15 minutes.

Defendant was convicted of the charged offense by a district court jury. The conviction was affirmed by the Kent Circuit Court. The Court of Appeals denied the defendant's application for leave to appeal. This Court granted leave to appeal. 411 Mich 1035 (1981).

Prior to trial, defendant moved to suppress the admission of the signed statement, alleging that it was taken in violation of his constitutional rights. It is conceded that defendant was not advised of his rights before he gave the statement. The motion was denied. Defendant contends in this Court that the trial court erred in concluding that the inculpatory statements and confession made by defendant were voluntary where obtained without prior *Miranda* warnings in a custodial environment by private security officers, one of whom was a moonlighting deputy sheriff from a neighboring county, and that reversal is required.

In *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the United States Supreme Court "established a conclusive presumption that all confessions or admissions made during a period of custodial interrogation are compelled in violation of the Fifth Amendment's privilege against self-incrimination". 2 Ringel, Searches & Seizures, Arrests & Confessions (2d ed), § 26.1, pp 26-1 to 26-2. This presumption can only be overcome by demonstrating that the defendant has received specified warnings of his rights and has been informed that these rights may be waived. Any such waiver must be made voluntarily, knowingly

and intelligently. Statements, whether exculpatory
or inculpatory, secured from a defendant in the
absence of these procedural safeguards may not be
used by the prosecution in any proceedings against
the defendant. This exclusionary rule applies to
federal proceedings and, by virtue of the Four-
teenth Amendment, to state proceedings as well.

Constitutional protections apply to governmen-
tal action only; thus, it generally has been held
that "a person not a police officer, or not acting in
concert with or at the request of police authority,
is not required to extend constitutional warnings
prior to the eliciting of an incriminating state-
ment". *People v Omell,* 15 Mich App 154, 157; 166
NW2d 279 (1968). In *Burdeau v McDowell,* 256 US
465, 475; 41 S Ct 574; 65 L Ed 1048 (1921), the
Supreme Court explained that the origin and his-
tory of the Fourth Amendment "clearly show that
it was intended as a restraint upon the activities
of sovereign authority, and was not intended to be
a limitation upon other than governmental agen-
cies". The Court held that evidence illegally seized
by a private individual could be used against an
accused in a grand jury investigation. The *Bur-
deau* Court recognized that such a rule of restraint
on government action was reasonable in light of
the traditional means available to private individ-
uals to redress their grievances. This concept has
been followed by our Court of Appeals in *People v
Holloway,* 82 Mich App 629; 267 NW2d 454 (1978).
In holding that the Fourth Amendment's prohibi-
tion against unreasonable searches and seizures
does not extend to activities by private security
guards, the Court wrote:

"[A]n individual has the right to redress any wrongs
which may have been committed by private citizens, be
they security guards or not. They can bring civil actions

or file criminal complaints against the alleged offenders. It is because the cloak of sovereign immunity is wrapped around law enforcement officials that the Fourth Amendment is applied to their actions (though today a somewhat ragged cloak)." 82 Mich App 633.

Thus, the exclusionary rule only applies if governmental involvement can be shown. Statements made to private individuals need not be preceded by *Miranda* warnings. *United States v Antonelli,* 434 F2d 335 (CA 2, 1970); *United States v Bolden,* 461 F2d 998 (CA 8, 1972); *United States v Casteel,* 476 F2d 152 (CA 10, 1973); *Schaumberg v State,* 83 Nev 372; 432 P2d 500 (1967); Anno: *Custodial Interrogation—Miranda Rule,* 31 ALR3d 565, 666-668.

Some decisions have held that private security guards who receive direct assistance from public police officers or who work in close connection with the police may be acting under color of state law, subject to constitutional restrictions.

In *Williams v United States,* 341 US 97; 71 S Ct 576; 95 L Ed 774 (1951), a private detective held a special police officer's card and badge and was accompanied by a city police officer in obtaining evidence. The detective had been hired by a private business to discover the identity of some thieves. In this instance, the Court found sufficient direct assistance from the public police to conclude that the private detective was acting under color of state law. The Alaska Supreme Court in *Tarnef v State,* 512 P2d 923 (Alas, 1973), held that a private arson investigator working at the direction of the local police had to advise the defendant of his constitutional rights before eliciting a statement. The Court noted that the private investigator had promised to turn any statements over to the police, had enlisted police assistance in gaining

access to the incarcerated defendant, and had regarded himself as a member of an official team. See, also, *Griffin v Maryland,* 378 US 130; 84 S Ct 1770; 12 L Ed 2d 754 (1964); *People v Jones,* 47 NY2d 528; 419 NYS2d 447; 393 NE2d 443 (1979); *People v Zelinski,* 24 Cal 3d 357; 155 Cal Rptr 575; 594 P2d 1000 (1979).

We do not believe that the activities of the store security guards and the city police in this case demonstrated the coordinated effort necessary to constitute state action. The Meijer security personnel were working with the view of furthering their employer's interest only; they were not acting as police agents. Their role may be viewed as an extension of the common-law shopkeepers' privilege to detain for a reasonable period of time a person suspected of theft or failure to pay. See *People v Raitano,* 81 Ill App 3d 373; 401 NE2d 278 (1980). There was no complicity with the police department or any indication that their acts were instigated or motivated by the police.

The security guards did not exceed the scope of their power to detain and question the suspected shoplifters. The security guards were in plain clothes; the detention did not last an unreasonably long time. While there was some indication that the suspects were nervous, the acts of the security guards did not present the kind of psychological coercion and threatening environmental custody addressed by *Miranda.*

"But the mere asking of questions is not illegal. And guarantees against self-incrimination do not turn solely on whether interrogators are state agents. Rather, they prevent the state from using involuntary answers as evidence * * * whether obtained by government or private conduct * * *. Statements obtained without manifest physical or psychological coercion usually are

deemed voluntary, though defendant never knew or waived his rights to silence and counsel." (Citations omitted.) *In re Deborah C,* 30 Cal 3d 125, 132; 177 Cal Rptr 852; 635 P2d 446 (1981).

Defendant also contends that Meijer security personnel qualified as law enforcement officers because state action has granted them greater authority than that possessed by private citizens. Citing *People v Eastway,* 67 Mich App 464; 241 NW2d 249 (1976), and Judge KAUFMAN's opinion in *People v Holloway, supra,* defendant believes that the licensing statutes which regulate private security guards demonstrate the requisite degree of state action to bring their activities under color of state law, subject to constitutional restraints. See MCL 338.1051 *et seq.;* MSA 18.185(1) *et seq.* We disagree. We do not believe that the mere licensing of security guards constitutes sufficient government involvement to require the giving of *Miranda* warnings. As stated by the Supreme Court of Ohio in *State v Bolan,* 27 Ohio St 2d 15, 18; 271 NE2d 839 (1971):

"In our opinion, the limited right of temporary detention extended to a merchant's employee by R.C. 2935.041, does not place him in the category of a 'law enforcement officer' within the purview of *Miranda.*

"Essentially this same conclusion has been reached almost uniformly by courts of other jurisdictions. The rationale of these cases is that the duty of giving '*Miranda* warnings' is limited to employees of governmental agencies whose function is to enforce law, or to those acting for such law enforcement agencies by direction of the agencies; that it does not include private citizens not directed or controlled by a law enforcement agency, even though their efforts might aid in law enforcement."

See, also, *People v Raitano, supra.*

Our statute specifically states that "private security police employed for the purpose of guarding the property and employees of their employer and generally maintaining plant security for their employer" need not be licensed. MCL 338.1079; MSA 18.185(29). This language speaks to the exact function performed by Meijer's security personnel. We do not believe that qualification for such licensing exclusion equates the actions of private security guards with those of law enforcement officers.

We also do not believe that the fact that Rick Cain was an off-duty deputy sheriff is controlling. Cain's role in the proceedings was quite limited. He did not secure the statement and came on the scene after one of his colleagues had already observed Raush secrete one of the tapes. While Cain observed the activities of the three men and aided in their apprehension, he identified himself as a Meijer employee. The incriminating statement was obtained by one of the other security guards. The mere presence of an off-duty deputy sheriff, particularly from another jurisdiction, is not a sufficient relationship to invoke the "color of law" theory noted above. See *People v Faulkner,* 90 Mich App 520; 282 NW2d 377 (1979).

The *Miranda* rule was established "to dispel the compulsion inherent in custodial surroundings". *Miranda v Arizona, supra,* 458. It is directed toward police conduct and is an attempt to prohibit lengthy interrogations in a custodial setting fraught with coercion and duress. We must conclude that in this case retail store security personnel who did not act at police instigation and functioned without police assistance and cooperation are to be regarded as private individuals. Therefore the statements made to the private security guards need not have been preceded by

*Miranda* warnings and are admissible into evidence against defendant.

The judgment of the Kent Circuit Court is affirmed.

WILLIAMS, COLEMAN, and RYAN, JJ., concurred with FITZGERALD, C.J.

KAVANAGH, J. *(for reversal).* This appeal concerns the admissibility of a confession obtained without *Miranda*[1] warnings by private security guards who took the defendant into custody, searched and questioned him in a store security office, and turned him over to the local police for prosecution. We hold as a matter of state constitutional law and court policy that the confession obtained by the private security guards should have been preceded by *Miranda* warnings and that in their absence it is inadmissible as evidence against the defendant. The decision of the Kent Circuit Court is reversed.

Defendant, Frederick Impens, was charged with disorderly conduct on the basis of a shoplifting incident at a Grand Rapids Meijer store. While walking through the store, security detective Rick Cain, an off-duty deputy sheriff from neighboring Allegan County, observed defendant and his two companions, Allen Raush and David Ronkema, in the musical tape aisle. Believing their behavior to be suspicious, Cain proceeded to the milk cooler, a vantage point from which activity in the tape aisle could be viewed. Charles Booth, another store detective, was already there and had observed one of the men concealing a tape on his person. Booth testified that he observed Allen Raush picking up tapes, removing the packaging, and concealing the

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

tapes inside his pants. Frederick Impens and David Ronkema were observed looking around, walking up and down the aisle, selecting tapes and setting them down in front of Mr. Raush, who concealed them in his clothes.

Cain and Booth followed the three men after they left the tape aisle and proceeded to different areas in the store. The security guards approached defendant and his companions and asked them to come to the security office. Some identification was shown, though Cain could not recall whether he showed his Meijer identification or his Sheriff's Department badge.

The officers were joined in the office by a third security guard, and the three suspects were searched. The tape cartridges and a watchband were found in Raush's possession. The security guards questioned the suspects, eliciting the necessary information to complete Meijer's form entitled "Loss Prevention Department Voluntary Statement". The statement was read to the defendant, and he signed it. There was no indication that defendant would not be released if the statement were not signed. The Grand Rapids police were called. The police arrived, and issued appearance tickets to Impens, Raush and Ronkema, and the three men left the security office. Charles Booth testified that they were in the security office for approximately 15 minutes.

Prior to trial, defendant moved to suppress the admission of the signed statement, alleging that it was taken in violation of his constitutional rights. The motion was denied. It is conceded that defendant was not advised of his rights before he gave the statement. Defendant was convicted of the charged offense by a district court jury. The conviction was affirmed by the Kent Circuit Court.

The Court of Appeals denied leave to appeal. This Court granted leave to appeal. 411 Mich 1035 (1981).

Defendant contends in this Court that the trial court erred in concluding that the inculpatory statements and confession made by defendant were voluntary where obtained without prior *Miranda* warnings in a custodial environment by private security officers.

Article 1, § 17 of the Michigan Constitution of 1963 provides: "No person shall be compelled in any criminal case to be a witness against himself". This safeguard against self-incrimination is at least as broad as the guarantee of the Fifth Amendment to the United States Constitution. In order to protect this right against self-incrimination, the Supreme Court of the United States in *Miranda v Arizona,* 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way". The people contend that in this case it was not necessary to advise the defendant of his rights or to employ other procedural safeguards because defendant was taken into custody and questioned by private persons, and not by police officers. We disagree. We are satisfied that plaintiff's classification of private security guards as "private persons" for *Miranda* purposes disregards the significance of, and the role played by, private security

personnel in today's society. While we recognize that *Miranda* did not deal with the private security guard situation, in order to effectuate Michigan policy we must extend the *Miranda* concept to apply to private security guard interrogation in a custodial setting.

In 1976, the Task Force on Private Security of the National Advisory Committee on Criminal Justice Standards and Goals reported:

" *'There are more than 1 million people involved in private security in the United States.* The private security industry is a multibillion-dollar-a-year business that grows at a rate of 10 to 12 percent per year. In many large cities, the number of private security personnel is considerably greater than the number of police and law enforcement personnel. Of those individuals involved in private security, some are uniformed, some are not; some carry guns, some are unarmed; some guard nuclear energy installations, some guard golf courses; some are trained, some are not; some have college degrees, some are virtually uneducated.

\* \* \*

" 'There is virtually no aspect of society that is not in one way or another affected by private security. A business may employ guards to protect persons and property from damage, injury or loss. Special security services are obviously required in places of public accommodation, such as airports, schools, and commercial complexes. *The pervasive involvement of private security plays a vital role in efforts to create a safe environment in which to work and live.'* " National Advisory Committee on Criminal Justice Standards and Goals, Private Security: Report of the Task Force on Private Security 3, 10-11 (1976), as quoted in Burkoff, *Not So Private Searches and the Constitution,* 66 Cornell L Rev 627, 646, fn 95 (1981) (emphasis added).

Unlike "the little old lady next door who has a

desire to assist in law enforcement",[2] private security guards are in the business of law enforcement. It is the nature of the activities of private security guards that distinguishes them from private persons. When private security guards perform functions that are traditionally governmental in nature, their action is tantamount to state action.[3] Judge Mack of the District of Columbia Court of Appeals described a case in point:

"[A] retail store security guard, who does more than protect his employer's property full-time, but who pursues, apprehends and detains criminals, who performs custodial searches (consensual or nonconsensual) or seizes and preserves evidence, and who interrogates and refers the criminal for prosecution is performing a police function exclusively reserved to the state." *United States v Lima,* 424 A2d 113, 122 (DC App, 1980). (Judge Mack, joined by Judge Kelly, *dissenting* but *concurring in result).*

In the instant case defendant and his companions were apprehended by Meijer security guards and taken to the security office. The guards conducted a "normal search [of the suspects] up

[2] *State v Coburn,* 165 Mont 488, 502; 530 P2d 442 (1974).

[3] "The public function strand of state action theory states that when a private citizen performs tasks and exercises powers that are traditionally governmental in nature, he will be treated as a government actor. He will be subject to the same restrictions as the government, even in the absence of direct contact between him and a government official or agency. *[Marsh v Alabama,* 326 US 501; 66 S Ct 276; 90 L Ed 265 (1946).]

\* \* \*

"The public function doctrine logically applies to private security cases. Policing is one of the most basic functions of the sovereign. When security personnel who are hired to protect business premises arrest, question and search for evidence against criminal suspects, they perform traditional public police functions." Euller, *Private Security and the Exclusionary Rule,* 15 Harv Civil Rights-Civil Liberties L Rev 649, 657-658 (1980).

against the wall"[4] and questioned them about the shoplifting incident. One of the guards wrote out confessional statements and requested the defendant and his companions to sign them. The Grand Rapids Police were called. A Meijer security guard, George Gruz, testified that "it's up to the security personnel as to whether a [shoplifting suspect] is prosecuted or just warned and released." He estimated that 20 to 40 suspects are detained for questioning each month.[5]

We find that in the instant case the Meijer security guards were acting as substitute police officers rather than merely as protectors of private property. The confession elicited by the private security guards should have been preceded by *Miranda* warnings and without them is inadmissible evidence.

Two additional issues were raised for consideration: the effect of the status of one of the security guards as an off-duty deputy sheriff from a neighboring county, and the effect of the Private Security Guard Act of 1968, MCL 338.1051 *et seq.;* MSA 18.185(1) *et seq.* In the instant case these issues are not determinative. It is the nature of the activities of the security guards that requires them to provide procedural safeguards for defendant's constitutional rights.

We agree with the observation that:

"Even where no express delegation of policing authority can be found, the exercise by private police of traditional public policing powers and the interdependency of private and public police forces dictate that private police should be subject to the same constitu-

---

[4] Testimony of a Meijer security guard, Rick Lee Cain.

[5] According to a security guard, Charles Booth, Meijer security guards receive 40 hours of training covering such areas as search and seizure, arrest, detention, and employee theft.

tional limitations that govern public law enforcement authorities.

"This conclusion follows not only from an application of established state action doctrine, but also from highly salutary public policy goals. One study of private police activity concluded:

" '[T]o the extent that the private police system in its activities and methods provides a means by which the public police are able to bypass, evade, or subvert systems of accountability and rules of procedure, the unregulated development of a closely interacting private and public police system will inevitably create serious problems.' " [Scott & McPherson, *The Development of the Private Sector of the Criminal Justice System,* 6 Law & Soc'y Rev 267, 284-285, fn 133 (1971).] Burkoff, *Not So Private Searches and the Constitution,* 66 Cornell L Rev 627, 657 (1981).

Chief Justice Warren made clear in the *Miranda* decision that requiring law enforcement officers to apprise the accused of his right against self-incrimination before any custodial interrogation is only one method of safeguarding the accused's constitutional rights:

"It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws." 384 US 467.

The courts in several states have recognized the threat which private security forces pose to indi-

vidual constitutional rights and have applied constitutional limitations to their actions.[6] We are convinced that limiting constitutional safeguards to public law enforcement authorities does not adequately protect the rights of the individual. In order to give meaningful protection to the constitutional right against self-incrimination, we hold that statements obtained by private security guards in a custodial setting must be preceded by *Miranda* warnings to be admissible in a subsequent criminal prosecution.

Reversed.

LEVIN, J., concurred with KAVANAGH, J.

The late Justice BLAIR MOODY, JR., took no part in the decision of this case.

---

[6] In *Peak v State,* 342 So 2d 98 (Fla App, 1977), the District Court of Appeals of Florida, Third District, held that an involuntary confession, whether made to law enforcement officers or private persons, is inadmissible. See, also, *Williams v State,* 376 So 2d 846 (Fla, 1979) (Justice Adkins, joined by Justices Boyd and Sandberg, *dissenting).*

The California Supreme Court in *People v Zelinski,* 24 Cal 3d 357; 155 Cal Rptr 575; 594 P2d 1000 (1979), held that when private security personnel go beyond their employer's private interests and fulfill a public function in bringing violators of the law to public justice, the state constitutional prohibition against unreasonable search and seizure affords protection against unlawful intrusive conduct and the exclusionary rule applies.

The Louisiana Supreme Court held in *State v Hutchinson,* 349 So 2d 1252 (La, 1977), that private searches and seizures are within the ambit of protection afforded by the state constitution.

In *State v Brecht,* 157 Mont 264, 270; 485 P2d 47 (1971), the Montana Supreme Court held that the exclusionary rule applies to private individuals as well as to law enforcement officers, because "[t]he violation of the constitutional right to privacy and against compulsory self-incrimination is as detrimental to the person to whom the protection is guaranteed in the one case as in the other." See, also, *State v Hyem,* — Mont —; 630 P2d 202 (1981); *State v Helfrich,* 183 Mont 484; 600 P2d 816 (1979); *State v Coburn,* 165 Mont 488; 530 P2d 442 (1974).