# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CRYSTAL FAYLA HENSLEY,

      Defendant-Appellant.

UNPUBLISHED
March 16, 2017

No. 331089
Oakland Circuit Court
LC No. 2014-249251-FH

Before: MARKEY, P.J., and WILDER and SWARTZLE, JJ.

PER CURIAM.

Defendant is charged with one count of delivery/manufacture of 5 to 45 kilograms (20 to 200 plants) of marijuana, contrary to MCL 333.7401(2)(d)(*ii*), and with one count of delivery/manufacture of marijuana, contrary to MCL 333.7401(2)(d)(*iii*). Defendant moved to suppress statements she made to the police during the police search of her premises and, after conducting a two-day *Walker*[1] hearing, the trial court denied defendant's motion. We granted leave to appeal[2] and now affirm.

## I. FACTS AND PROCEDURAL HISTORY

At the *Walker* hearing, Sergeant Craig White of the Madison Heights Police Department, testified that on August 1, 2013, while working as a plain clothes detective assigned to the Oakland County Narcotics Enforcement Team [OCNET], he and a five-person police team executed a search warrant on a home owned by defendant's husband. All team members were armed and because they were working undercover, wore masks. They went to the front door intending to knock, but a person inside opened the door for them.[3] The team then conducted a

---

[1] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[2] *People v Hensley*, unpublished order of the Court of Appeals, entered February 23, 2016 (Docket No. 331089).

[3]Sergeant White had been informed that there was a marijuana growing operation in the home and recognized that it could be legal, but said he did not have access to information concerning

-1-

sweep of the home to secure the premises, finding seven to eight people, including two adults, teenagers, and defendant's 12- and 9-year-old daughters. The occupants were brought to the living room and some of them were handcuffed but they were not held at gunpoint. One officer stayed with the occupants in the living room while the rest conducted a search. A locked game room that contained marijuana was found along with a locked "grow room" in the basement that had marijuana plants. The police forced open the doors to gain access.

Sergeant White obtained the cellular telephone number of defendant's husband, Joseph Hensley, and called him at work, informing him that his home was being searched and that he should return home. Hensley, in turn, called defendant, informed her about the search, and urged her to return home. Defendant arrived about 45 minutes after the search had started, after the marijuana had been discovered. Sergeant White recalled that he met with defendant on the front lawn and informed her that he had a search warrant for the home to search for narcotics, and that they had discovered marijuana. He was no longer wearing his mask. Sergeant White specifically told defendant she was not under arrest. He never told her, however, that she was free to leave, never gave her the *Miranda*[4] warnings, never asked if she had any prior police contacts, and never asked if she had a learning disability or if she was dyslexic.[5] Sergeant White testified that while they were talking, defendant appeared to comprehend the questions he did ask and gave detailed answers.

Sergeant White asked defendant if she had valid medical marijuana paperwork. According to Sergeant White, defendant responded that the marijuana grow operation belonged to her husband, and he had the paperwork for it. Defendant and Sergeant White then walked to the bedroom to obtain some medical marijuana paperwork that she said was there. Sergeant White testified that defendant produced some medical marijuana paperwork and her own medical marijuana patient card, but defendant claimed that there was a masked police officer in the bedroom and that the medical marijuana paperwork was already spread out on the bed. Defendant then told Sergeant White that she did not know the location of the key and combination for the locks on the grow room, but she called Hensley and obtained that information and then gave it to White. Sergeant White asked defendant if she helped with the marijuana cultivation or watered the plants, and she responded that she had helped by trimming the plants. She was then escorted to the living room and detained with the other occupants; she was not handcuffed but was never told she was free to leave.

Sometime later, Sergeant White came back and asked defendant to give him a written statement concerning the verbal statements she had made to him. Defendant claimed that

---

whether it was a legal operation; he explained that because this might have been a legal marijuana operation, he sought to gain consensual entry rather than breaking in the door.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[5] Defendant never volunteered that she had these disabilities, and no evidence was ever presented to suggest that she suffered from any physical or cognitive disability. Defendant, who was 35 years old at the time, had dropped out of the 10th grade and had held various jobs involving manual labor. She claimed that she was not a good speller and had problems writing. She stated that her only other contact with police was one time when she was stopped for speeding.

Sergeant White took her to the bedroom and, with another officer present, told her she could be arrested and charged and that he wanted her to write a statement; she did not believe she had any choice. In the statement she said: "I, Crystal Hensley, am a patient and my husband, Joe, is a patient and a care giver to two patients. Grow [sic] in the basement belongs to him. I sometimes help with the trimming." Sergeant White did not read defendant the *Miranda* warnings at any time, and specifically did not do so before interviewing defendant or asking her to write a statement. Defendant testified that the police told her what to write, but she acknowledged that the words in the statement were not the ones she testified that the police told her to write, and she further agreed that the statement was true. Sergeant White estimated that he spoke with defendant for a total of about 15 minutes.

The trial court ruled that, considering the totality of the facts, the prosecution had established that defendant was not in custody and that her statements were voluntary.[6]

## II. CUSTODY

Defendant first argues that the trial court erred in holding that her statements were admissible, contending that she was subjected to custodial interrogation without benefit of the *Miranda* warnings and without waiving the rights enumerated in those warnings. We disagree.

Defendant filed a motion to suppress in the trial court and a *Walker* hearing was conducted, so this issue has been preserved for appellate review. *People v McCrady*, 244 Mich App 27, 29; 624 NW2d 761 (2000). "This Court reviews de novo the trial court's ultimate ruling on the defendant's motion to suppress." *People v Smart*, 304 Mich App 244, 247; 850 NW2d 579 (2014), quoting *People v Brown*, 279 Mich App 116, 127; 755 NW2d 664 (2008). "The trial court's findings of fact at a suppression hearing are reviewed for clear error." *Smart*, 304 Mich App at 247.

It is well-established that a person who is in custody must be given specific warnings regarding the person's constitutional rights to remain silent and to counsel before being subjected to police interrogation or its functional equivalent. *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966); *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013). It is also well-established "that *Miranda* warnings need be given only in situations involving a custodial interrogation." *People v Anderson*, 209 Mich App 527, 532; 531 NW2d 780 (1995). As this Court summarized in *People v Zahn*, 234 Mich App 438, 449; 594 NW2d 120 (1999):

---

[6] The trial court also considered testimony by Joseph Hensley concerning his interactions with the police after he arrived at the home, and concluded that he was not in custody and that his statements were voluntary. After answering some questions concerning the grow operation and admitting that he was probably over the amount of cultivated marijuana he was allowed to possess, Joseph Hensley was given *Miranda* warnings and the interview continued. The trial court ruled that Joseph Hensley was not in custody and his statements were voluntary. We are not called upon in this appeal by defendant to determine if the trial court's rulings with regard to her husband were correct.

The term "custodial interrogation" means " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of movement in any significant way.' " *People v Hill*, 429 Mich 382, 387; 415 NW2d 193 (1987), quoting *Miranda*, *supra* at 444. To determine whether a defendant was in custody at the time of the interrogation, we look at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that [s]he was not free to leave. *People v Roark*, 214 Mich App 421, 423; 543 NW2d 23 (1995). The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v California*, 511 US 318, 323; 114 S Ct 1526; 128 L Ed 2d 293 (1994).

In determining whether an individual has been subjected to police custody, a court must consider the totality of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v Beheler*, 463 US 1121, 1125; 103 S Ct 3517; 77 L Ed 2d 1275 (1983), quoting *Oregon v Mathiason*, 429 US 492; 97 S Ct 711; 50 L Ed 2d 714 (1977). See also *People v Roberts*, 292 Mich App 492, 505; 808 NW2d 290 (2011) ("Whether an individual is effectively 'in custody' is based on the totality of the circumstances.")

In *Mathiason*, the defendant was asked to meet with police for an interview. He voluntarily went to the police station. On review of the trial court's decision not to suppress the defendant's statement, the Oregon Supreme Court determined that the defendant was in custody and his statement should be suppressed. The United States Supreme Court reversed and stated:

> In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of

-4-

coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited. [429 US at 495.]

The totality of the circumstances in this case are: (1) defendant was informed by her husband that the police were at their home executing a search warrant and she should return there; (2) defendant voluntarily drove to her home; (3) she saw police officers at her home; (4) she met Sergeant White who told her the police were executing a search warrant; (5) Sergeant White informed defendant she was not under arrest; (6) pursuant to the legal search of the home, the police had discovered marijuana; (7) Sergeant White was aware that defendant's husband was purportedly a medical marijuana caregiver and that he and defendant were possibly medical marijuana patients; (8) defendant informed Sergeant White that she was a medical marijuana patient; (9) all of the police at the scene were armed, but none of them drew or pointed their weapons at defendant; (10) some of the officers wore masks, but to conceal their identities—it was clear that all of them were police officers; (11) during his discussions with defendant, Sergeant White's face was unmasked; (12) defendant was not handcuffed at any time; (13) defendant was asked if she had paperwork to verify the legal status of the marijuana operation; (14) accompanied by Sergeant White, and possibly another officer, defendant went to her bedroom to obtain the paperwork; (15) on the way to the bedroom, defendant was able to observe that the occupants of the house, including her children, had been rounded up and detained in the living room; (16) with the exception of defendant's two young daughters, the remaining occupants were all handcuffed;[7] (17) according to Sergeant White, defendant produced some paperwork and her medical marijuana patient card, but the paperwork dealt with the application for a medical marijuana license or patient card and did not answer the question whether the operation in the home was legal; (18) defendant claimed that the paperwork was already spread out on the bed but she did not explain what that paperwork consisted of and, given her claimed lack of involvement in her husband's marijuana business, she would not necessarily have been equipped to make that assessment; (19) Sergeant White asked defendant for the key to the marijuana grow room and the combination to the combination lock for that room and, after calling her husband to get that information, she gave it to the police; (20) defendant claimed that White asked if she was involved with her husband's grow operation and whether she watered the plants, and that she explained that it was her husband's and she generally had nothing to do with it but had helped by trimming the plants on at least one occasion; (22) Sergeant White later asked defendant if she would make a written statement setting out what she had told him and she agreed to do so; (23) defendant claimed that White told her she could be charged and arrested and ordered her to write a statement; (24) defendant further claimed that she wrote what the police officer told her to write, but she subsequently agreed that the words were hers and they were true; (25) defendant was 35 years old, had a tenth grade education, and there is no indication that she had trouble understanding Sergeant White and she did not indicate to him (or to the trial court) that she had any cognitive issues that would

---

[7] The United States Supreme Court has ruled that the police may handcuff occupants in a residence while a search is being conducted to protect the safety of investigating officers. *Muehler v Mena*, 544 US 93, 99-100; 125 S Ct 1465; 161 L Ed 2d 299 (2005).

have prevented her from understanding what was happening or what he was saying to her; (26) Sergeant White never told defendant she was free to leave; (27) Sergeant White's interaction with defendant lasted about 10 to 15 minutes and after it was completed, defendant was brought to the living room and was required to stay with the other occupants, but she was not handcuffed; (28) defendant was not arrested that day; and (29) the search took about two hours and after it was concluded, the police left.

The police questioning in this case occurred in defendant's home. "[I]nterrogation in a suspect's home is usually viewed as noncustodial." *People v Coomer*, 245 Mich App 206, 220; 627 NW2d 612 (2001), quoting *Mayes (After Remand)*, 202 Mich App 181, 196; 508 NW2d 161 (1993) (Corrigan, P.J., concurring). Defendant knew that the police were at her home executing a search warrant when she voluntarily went there. When she first encountered the police, she was told she was not under arrest. Her interaction with the police was relatively short (10 to 15 minutes), as was the overall time the police were present in her house (approximately two hours). As the Supreme Court observed in *Michigan v Summers*, 452 US 692, 701; 101 S Ct 2587; 69 L Ed 2d 340 (1981), it may be assumed that most citizens would choose to remain at their residence to observe the police while they conduct a search.

Defendant was detained during the course of the search, but she was not handcuffed. In *People v Jones*, 301 Mich App 566, 580; 837 NW2d 7 (2013), the defendant was asked by the police to remain with her children in the rear seat of a police cruiser following a traffic stop. Marijuana was then found in the defendant's car along with some medical marijuana caregiver and patient paperwork for the defendant and others. The police questioned the defendant at the scene and while she was being transported to the police station, but she "was released without being charged after the questioning was completed." 301 Mich App at 569-570. This Court found that the defendant was not in custody.

In this case, the brief detention and questioning occurred in defendant's home. Similar to *Jones*, the questioning involved the police trying to determine if defendant could legally possess the marijuana that had been discovered (where there was some evidence that it may have been possessed in accordance with the Medical Marijuana Act), and defendant's children were in relatively close proximity. In contrast to *Jones*, defendant was never taken to the police station.

Additional factors suggest that defendant was not in custody. Defendant was permitted to call her husband on her cell phone. Because there were other family members present in her home, she was not isolated and deprived of any source of support; that is, while the experience may have been stressful, defendant was not forced to undergo it alone in an interview room in a police station. Although she was detained by the police, the detention was associated with the execution of a valid search warrant. There is no indication that the police embarked on the search as a means of questioning defendant (or her husband). Instead, the minimal questioning that the police did conduct was related to the object of the search: investigating the marijuana that was discovered at the house pursuant to a valid search. The limited questioning was directed at determining whether defendant had proper paperwork that would establish that the marijuana growing operation was legal and that the amount of marijuana was permitted by the number of authorized medical marijuana patients.

The police are permitted to ask general on-the-scene questions to investigate the facts surrounding a crime without implicating *Miranda*. *People v Hill*, 429 Mich at 398. Quoting language from the *Miranda* decision, our Supreme Court reasoned:

> It can be argued that police officers should inform every person of whom they ask a question that the question need not be answered. However, whether this would have a socially beneficial effect is doubtful, and this approach was specifically, and with good reason, rejected in *Miranda*:

> > General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present. [384 US 477-478.]

> Once it is recognized that it is proper for members of society to voluntarily answer appropriate questions of law enforcement officers, it is difficult to conceive why a line should be drawn which might encourage silence simply because the person being questioned is the focus of a police investigation. It is desirable that such an individual also speak frankly and voluntarily to the police. However, he must never be put in a position where he feels that he must speak even though he prefers not to do so. Thus, we protect prime suspects through the reading of the *Miranda* warning, as we do any other individual, when he is in a situation in which he may perceive that he must speak against his will, i.e., during custodial interrogation. The purpose of the *Miranda* rule is to redress the disadvantage inherent in a custodial setting, not to create a confrontational atmosphere in the more neutral noncustodial environment. [429 Mich at 398-399.]

Defendant emphasizes that she "did not go to her home for the specific purpose of police interrogation and she did not have a conversation with the police prior to her arrival agreeing to be subject to custodial interrogation upon her arrival." She emphasizes that she was detained for 1½ to 2 hours, was surrounded by armed police officers (five of whom had masks on), that her movement was restricted, that she was not given *Miranda* warnings, that she was never told she was free to leave, that she was never told she did not have to talk with the police, and that she was twice interrogated in her bedroom – isolated from her family, and was "paraded" past her handcuffed family on the way to the bedroom. Defendant also emphasizes that she was terrified and thought she was under arrest and was going to jail.

Defendant overstates her situation. As noted, she was told by her husband that the police were at their home executing a search warrant. Thus, when she voluntarily returned to her home, she could not have been surprised to find police there. The police officer she primarily interacted with, Sergeant White, was not masked, and he informed her at their initial meeting that she was *not under arrest*; defendant was never handcuffed or told she was under arrest.

Defendant was escorted by or accompanied the police to her bedroom *because that is where she informed them that the medical marijuana paperwork was located*. On the way to the bedroom from the front door, she passed by her family members in the living room *because in order to get to the bedroom from the entrance to the home, it was necessary to pass by the living room*; defendant was not "paraded" by her handcuffed family members to intimidate her. Defendant admits that she was allowed to call her husband but she complains on appeal that she was not "continuously on the telephone." There is, however, no indication that she ever asked the police if she could remain on the telephone with her husband and that they refused such a request.

Defendant argues that the cited caselaw deals with Fourth Amendment issues rather than the Fifth Amendment issues presented in this case. Defendant misperceives the application of these cases. Because the police were properly permitted to detain the home's occupants (including defendant) while they conducted their authorized search, it cannot be said that they "staged" the setting to intimidate defendant and coerce her into talking with them. Had defendant said nothing at all, she and her family would still have been detained because of the ongoing search. The purpose of the detention was not to coerce defendant into agreeing to talk with the police. Indeed, the police did not know whether defendant was at home when they executed the search warrant, and could not know whether she would arrive home while the search was underway. The police were present for the purpose of conducting a search for contraband, not to question suspects. Defendant emphasizes that her family was detained by armed police officers, suggesting that this scenario was intentionally created to intimidate her into talking. The detention was consistent with proper police procedure, however, and the detention of family members occurred before defendant arrived, defendant never saw any drawn weapons, and defendant was specifically told when she arrived that she was not under arrest.

Defendant claims that the trial court failed to "specifically apply *Miranda*" in its decision. This is simply not correct. The trial court noted that the issue was whether the police were required to give defendant her *Miranda* rights before conducting a custodial interrogation: "The question really is whether or not Mr. and Mrs. Hensley were in custody." The court then discussed what the caselaw said with respect to when a suspect is in custody. The court quoted a passage from *Rhode Island v Innis*, 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980), that specifically referenced *Miranda*. The court cited several more cases dealing with how a court is to determine whether a person is in custody. The court was also clearly aware that defendant was not given *Miranda* warnings while her husband was given the warnings: "Neither of the defendants were [sic] given their constitutional rights until Mr. Hensley mentioned that he might be over [the statutory limit] and at which point, Sergeant White did Mirandize Mr. Hensley. . . ." These statements make it clear that the court was aware of the issue it was tasked with deciding.

> Factual findings are sufficient as long as it appears that the trial court was aware of the issues in the case and correctly applied the law. *People v Armstrong*, 175 Mich App 181, 185; 437 NW2d 343 (1989). The court need not make specific findings of fact regarding each element of the crime. *People v Wardlaw*, 190 Mich App 318, 320-321; 475 NW2d 387 (1991); *People v Vaughn*, 186 Mich App 376, 384; 465 NW2d 365 (1990). A court's failure to find the facts does not require remand where it is manifest that the court was aware of the factual issue, that it resolved the issue, and that further explication would not facilitate review.

*People v Jackson*, 390 Mich 621, 627 n 3; 212 NW2d 918 (1973). [*People v Legg*, 197 Mich App 131, 134-135; 494 NW2d 797 (1992).]

Defendant also claims that the trial court failed to "place on the record during its oral ruling crucial testimony of [defendant] and [Sergeant] White." The "crucial testimony," according to defendant, was (1) that defendant testified that she was not given the *Miranda* warnings; (2) that defendant testified she was detained; (3) that Sergeant White testified that he did not give defendant the *Miranda* warnings; and (4) that Sergeant White specifically stated that defendant was detained. As already indicated, however, the trial court summarized that neither defendant nor her husband were given *Miranda* warnings until Hensley stated that he was probably over the limit, at which point *he* was given the warnings. This summary by the court was sufficient to indicate that it was aware that defendant was never given the warnings. Moreover, there is no dispute that defendant was *not* given the warnings. And the issue of whether defendant was given the warnings is a secondary issue; the primary issue is whether defendant was *in custody*, because it is only the fact of custody that gives rise to the requirement that the police give a defendant the *Miranda* warnings. The court determined that defendant was not in custody and the police were therefore not required to give her the warnings. There was no dispute that defendant was detained until the search was completed.

Courts of this state have repeatedly held that the mere fact of detention, without more, is not enough to conclude that a defendant was "in custody" for purposes of the Fifth Amendment. See *City of Grand Rapids v Impens*, 414 Mich 667, 675; 327 NW2d 278 (1982); *People v Steele*, 292 Mich App 308, 317-319; 806 NW2d 753 (2011); *Mayes*, 202 Mich App at 196-197; *People v Edwards*; 158 Mich App 561, 563; 405 NW2d 200 (1987). Officers, however, cross the threshold from allowable detention to custody when they create a coercive or threatening environment in which a potential defendant does not feel free to refuse to answer questions or otherwise end the police encounter. See *Impens*, 414 Mich at 675; *Mayes*, 202 Mich App at 196-197.

In *Summers*, 452 US at 705, the United States Supreme Court discussed "the limited authority [police officers have] to detain the occupants of the premises while a proper search is conducted." The Court stated:

The detention of one of the residents while the premises were searched, though admittedly a significant restraint on his liberty, was surely less intrusive than the search itself. Indeed, we may safely assume that most citizens – unless they intend flight to avoid arrest – would elect to remain in order to observe the search of their possessions. Furthermore, the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in respondent's own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station. In sharp contrast to the custodial interrogation in *Dunaway* [*v*

-9-

*New York*, 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979)], the detention of this respondent was "substantially less intrusive" than an arrest.

> In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. [452 US at 701-703.]

The Supreme Court further observed that: "[T]he detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. The existence of a search warrant, however, also provides an objective justification for the detention." *Id*. at 703.

In this case, officers validly detained the occupants of the home to protect the safety of the those executing the search warrant. Defendant voluntarily arrived at the home and assisted officers in the search. Unlike many of the other occupants, she was not handcuffed or restrained in any manner. No one pointed a weapon at her or threatened her in any manner. Her detention follows only from an officer's direction to her to stay in the living room while others completed the search. No one asked questions of her while she was detained but rather requested her presence in another room of the house. We therefore conclude that defendant's detention was not subject to the type of coercion necessary to implicate *Miranda*.

Finally, we reiterate that the issue of whether a defendant is in custody requires application of a reasonable person standard rather than a subjective standard. *Roberts*, 292 Mich App at 504. Defendant focuses on her testimony that she was terrified and fearful that she was going to be arrested, but that does not establish that she was in custody. The question is whether a reasonable person in her situation would feel that she was in custody. Where defendant was told she was not under arrest, was not placed in handcuffs, was never physically touched or restrained, was allowed to call her husband, was only briefly detained, and the detention was incidental to the valid search of the premises, we conclude that the trial court correctly concluded that defendant was not in custody. Therefore, the police were not required to advise defendant of the *Miranda* warnings before they questioned her.

## III. VOLUNTARINESS

Defendant also contends that her statements to the police were not voluntary. This Court reviews de novo a trial court's determination regarding the voluntariness of a defendant's statement. *People v Ryan*, 295 Mich App 388, 396; 819 NW2d 55 (2012). "Deference is given, however, to the trial court's assessment of the credibility of the witnesses and the weight accorded to the evidence. The trial court's factual findings are subject to reversal only if they are clearly erroneous, meaning that the Court is left with a firm and definite conviction that a mistake has been made." *Id*. (internal citation omitted). The test to be applied "is whether, considering the totality of all the surrounding circumstances, the [statement] is 'the product of an

-10-

essentially free and unconstrained choice by its maker,' or whether the accused's 'will has been overborne and his capacity for self-determination critically impaired . . . .'" *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988), quoting *Culombe v Connecticut*, 367 US 568, 602; 81 S Ct 1860; 6 L Ed 2d 1037 (1961). We find no error in the trial court's determination.

When determining whether a defendant's statement is voluntarily made, our Supreme Court has found it useful to apply a non-exclusive list of factors, including:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the [statement] indicates that it was freely and voluntarily made. [*Cipriano*, 431 Mich at 334; internal citations omitted.]

The trial court cited *Cipriano*, and endeavored to make an assessment of the relevant facts as developed by the testimony at the hearing. The court noted that defendant (1) was an adult; (2) she did not have a high school diploma; (3) she did not manifest any disability in terms of verbal or written communication; (4) she appeared to be of at least average intelligence; (5) she had no previous experience with the police; (6) there was no prolonged questioning by police because while the entire search lasted only about two hours, the questioning itself occupied only about 5 to 15 minutes; (7) defendant was not advised of her constitutional rights; (8) she was not injured, intoxicated, drugged, or in ill health; (8) she was not deprived of food, sleep, or medical attention; (9) she was not physically abused or touched; (9) defendant claimed that Sergeant White threatened to charge her; (10) defendant was told she was not under arrest, she was not placed under arrest during the time the police were at her home, and she was not arrested that day; (11) she was not handcuffed; (12) she voluntarily went to her home knowing that the police were executing a search warrant; (13) no guns were pointed at the occupants; and (14) the encounter between defendant and the police occurred at her home. The court also noted several other facts during the course of its summary of the testimony of the witnesses: (15) there were armed police officers present at the house, some of whom were wearing masks (although Sergeant White was not), but they were clearly identified as police officers and two of them were uniformed officers; (16) Sergeant White did not raise his voice or yell at defendant; and (17) she was allowed to call her husband.

We further observe that the police did not engage in persistent, intense questioning over an extended period of time in an effort to sap defendant's willpower. The initial questioning occurred immediately after defendant arrived at her home, and was directed at securing medical

marijuana paperwork and the key to a padlock and the combination for a combination lock. The subsequent questioning occurred after defendant had been detained approximately 40 minutes, but it consisted only of the request that she make a written statement of what she had already told the police.[8] On the contrary, Sergeant White's questioning was very limited and appears to have been directed at determining whether defendant had evidence demonstrating that she and her husband possessed the marijuana legally. The court found that both Sergeant White and defendant had indicated that at their initial encounter, White asked if defendant had medical marijuana paperwork, and they proceeded to the bedroom so she could show him the paperwork that she had.[9] As Sergeant White testified, and as the trial court noted, the police are unable to verify the status of medical marijuana users. Had defendant been able to show Sergeant White paperwork indicating that the amount of marijuana discovered in the home was under the amount authorized by the Medical Marijuana Act, it is likely that no charges would have subsequently been filed.

Defendant appears to particularly concentrate on the giving of the written statement, presumably because defendant claims that before she was asked to provide a written statement, Sergeant White told her that she could face criminal charges. Yet, because the written statement only recorded what she had already verbally told White, and because she acknowledged that the words were her own and that they were true, this Court concludes that the written statement was also voluntarily made.

Considering the relevant factors, this Court concludes that the trial court correctly determined that defendant's statements to the police were voluntary.

Affirmed.


/s/ Jane E. Markey
/s/ Kurtis T. Wilder
/s/ Brock A. Swartzle

---

[8] While there was a dispute concerning whether defendant was threatened with criminal charges before she made the written statement, the statement itself did not relate any new information; it was merely a written statement of what defendant had already disclosed to the police, and she admitted it was true.

[9] The trial court noted the discrepancy between Sergeant White's testimony that defendant provided the paperwork and defendant's claim that the paperwork was spread out on the bed when she entered the bedroom. The trial court found that this discrepancy did not make "a big difference" and this Court agrees. There was already a police officer in the bedroom when defendant and Sergeant White entered. It is possible that while Sergeant White was meeting with defendant, the other officer came across the paperwork as he searched the bedroom. Even if the paperwork had already been found, Sergeant White may not have known that it been discovered.